783 F.2d 1488
 54 USLW 2450, 19 Fed. R. Evid. Serv. 1279
 In the Matter of CERTAIN COMPLAINTS UNDER INVESTIGATION BY
AN INVESTIGATING COMMITTEE OF the JUDICIAL COUNCIL
OF the ELEVENTH CIRCUIT.
Betty Ann WILLIAMS and Alan Ehrlich, as members of the
official staff of the Honorable Alcee L. Hastings,
and the Honorable Alcee L. Hastings,
United States District Judge,
Plaintiffs-Appellants,
v.
Spencer MERCER, as Clerk of the United States Court of
Appeals for the Eleventh Circuit; and the Honorable John C.
Godbold, Chief Judge of the Eleventh Circuit, the Honorable
Gerald Bard Tjoflat and Frank M. Johnson, Jr., Judges of the
United States Court of Appeals for the Eleventh Circuit, and
the Honorable Sam C. Pointer and William C. O'Kelley, Judges
serving on United States District Courts within the Eleventh
Circuit, as members of a committee known as the
Investigating Committee of the Judicial Council of the
Eleventh Circuit, Defendants-Appellees.
 Nos. 85-2054, 85-5420.
 United States Court of Appeals,
Eleventh Circuit.
 Feb. 20, 1986.
 
 Terrence J. Anderson, Coral Gables, Fla., Robert Catz, Cleveland, Ohio, for plaintiffs-appellants.
 John Doar, New York City, G. Stewart Webb, Baltimore, Md., for defendants-appellees.
 Daniel Simons, Ft. Lauderdale, Fla., pro se.
 Jeffrey Miller, Ft. Lauderdale, Fla., pro se.
 Richard K. Willard, Asst. Atty. Gen., Dept. of Justice, Civ. Div. Brook Hedge, Washington, D.C., Stanley Marcus, U.S. Atty., Miami, Fla., for U.S.
 Appeal from the United States District Court for the Southern District of Florida.
 Before CAMPBELL*, Chief Judge, KEARSE**, Circuit Judge, and PELL***, Senior Circuit Judge.
 LEVIN H. CAMPBELL, Chief Judge:
 
 
 1
 This opinion concerns the latest of the cases stemming from the Eleventh Circuit's investigation of Judge Alcee Hastings, a judge of the United States District Court for the Southern District of Florida. Judge Hastings and, in the instant case, present and former members of his staff have strongly challenged the legal and constitutional propriety of the investigation itself, of the Act of Congress which authorizes and directs judicial councils to conduct such investigations, and of many of the procedures involved.
 
 
 2
 The current opinion disposes of two separate proceedings which were consolidated and heard together before us on June 17, 1985.[1]
 
 
 3
 The first of these consisted of original subpoena enforcement proceedings commenced in this court by the Investigating Committee of the Judicial Council of the Eleventh Circuit (the "Investigating Committee" or "Committee") under the asserted authority of the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980, 28 U.S.C. Secs. 332(d)(1), 372(c)(9)(A) ("the Act"). In these proceedings, the Committee seeks orders enforcing subpoenas that the Committee caused to be issued under seal of the United States Court of Appeals for the Eleventh Circuit to Betty Ann Williams, Alan Ehrlich, Daniel Simons, and Jeffrey Miller. Ms. Williams is the secretary, and the three others are law clerks or former law clerks, of Judge Hastings.
 
 
 4
 The second matter is an appeal by Ms. Williams, Mr. Ehrlich and Judge Hastings from a judgment of the United States District Court for the Southern District of Florida (Wilkens, J., sitting by designation) dismissing, for lack of subject matter jurisdiction, their action seeking injunctive, declaratory and other relief against the above-mentioned subpoenas to Williams and Ehrlich, 610 F.Supp. 169 (D.Fla.1985).
 
 
 5
 Both of the above matters raise similar issues, to wit: 1) whether the Act confers original jurisdiction upon the United States courts of appeals to enforce or quash subpoenas issued under the Act, and 2) whether the subpoenas in question are valid and enforceable despite appellants'[2] claims of privilege and of various constitutional and technical defects. We answer both questions in the affirmative, enforcing the Committee's subpoenas to Williams and Ehrlich, directing Simons and Miller to testify before the Committee in response to the matters as to which they have refused, and affirming the dismissal of the district court action.
 
 I. PROCEEDINGS TO DATE
 
 6
 The history of the Committee's investigation of Judge Hastings' judicial conduct has been set out in our earlier opinion, In re Petition to Inspect and Copy Grand Jury Materials, 735 F.2d 1261, 1263-64 (11th Cir.1984), and need not be repeated here. Further background may be found in Hastings v. Judicial Conference of the United States, 593 F.Supp. 1371 (D.D.C.1984), vacated and remanded, 770 F.2d 1093 (D.C.Cir.1985), which, among other things, sets out the complaint against Judge Hastings that is the focus of the present investigation. Filed on March 17, 1983, by two judges of district courts within the Eleventh Circuit, the complaint alleges that Judge Hastings has engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts and has violated several Canons of the Code of Judicial Conduct for United States Judges, adopted by the Judicial Conference of the United States. Its most serious allegations are that Judge Hastings has conspired to obtain a bribe in return for an official judicial act. Other allegations are as follows: 1) that Judge Hastings made "public and unfounded statements" that the United States was prosecuting him on racial/political grounds; 2) that Judge Hastings has exploited his judicial position by accepting financial donations from lawyers and others to defray the costs of his criminal defense; 3) that in particular cases Judge Hastings has "completely abdicated and delegated" his decisionmaking authority to his law clerk; 4) that Judge Hastings has told counsel in a judicial proceeding that he had read an important precedent when he knew he had not; and 5) that Judge Hastings has exploited his judicial position by soliciting funds for someone he knew was a convicted federal offender. Id. at 1376-77.
 
 
 7
 We now proceed to a fuller description of the specific matters before us.
 
 
 8
 A. The Committee's Original Subpoena Enforcement Proceedings
 
 
 9
 In May 1985 the Committee, acting through the Chief Judge of the Eleventh Circuit, directed that subpoenas be issued and served on Williams, Ehrlich, Simons, and Miller commanding each to appear before it on a specified date later that month, and directing Williams to produce the originals of certain appointment diaries, telephone logs, and the like from Judge Hastings' chambers.[3] Each subpoena was issued by the clerk of the United States Court of Appeals for the Eleventh Circuit under the seal of that court, as provided in 28 U.S.C. Sec. 332(d)(1), and was signed by the Chief Judge as well as by the clerk of that court. Representatives of the Federal Bureau of Investigation served each subpoena and tendered the appropriate mileage and witness fees at the time of service.
 
 
 10
 The subpoena to Williams commanded her to appear to testify before the Committee on May 20, 1985, and bring with her the indicated documents.[4] She did not, however, appear on that date but instead filed in this court a document which she styled as a Notice of Objection to Subpoena and Subpoena Duces Tecum and of Intent to Seek Protective Order and Other Relief. In this she claimed a privilege purportedly protecting against disclosure of in-chambers communications among a judge and his staff. Following the Committee's filing of a motion for contempt, we issued an order requiring Williams to show cause why she should not be adjudged in contempt, but subsequently withdrew that order. The Committee then filed in this court what it called a Motion for an Order Enforcing the Subpoena and Directing Betty Ann Williams to Testify as to All Pertinent Matters.
 
 
 11
 The subpoena to Ehrlich commanded him to appear to testify before the Committee on May 27, 1985. Before that date, Ehrlich filed in this court a so-called Notice of Objection to Subpoena and Subpoena Duces Tecum and of Pending Case Challenging Subpoena and Seeking Injunctive and Other Relief, and a Motion to Quash or Recall Subpoena and Supplemental Notice of Objections. In his filings Ehrlich asserted a privilege similar to that claimed by Williams. Ehrlich did not appear on May 27. The Committee then filed in this court what it entitled a Motion for an Order Directing Alan Ehrlich to Testify as to All Pertinent Matters.
 
 
 12
 The subpoenas to both Simons and Miller commanded them to appear to testify before the Committee on May 27, 1985. Before that date, Simons filed in this court a Notice of Objection to Subpoena and Request for Judicial Clarification and Motion to Quash Subpoena. This filing relied on a claim of privilege similar to that raised by Williams and Ehrlich. Miller filed no papers in response to the subpoena. Both Simons and Miller appeared and testified before the Committee on May 28, but both refused to testify, on grounds of privilege, about communications among Judge Hastings and his staff. The Committee then filed in this court motions for orders directing Simons and Miller to testify as to all pertinent matters.
 
 B. The District Court Action
 
 13
 On May 20, Judge Hastings, Williams and Ehrlich brought the district court action from which they now appeal by filing a complaint against the Committee and the clerk of this court (viz., of the Court of Appeals for the Eleventh Circuit) in the United States District Court for the Southern District of Florida. The complaint sought injunctive relief to restrain enforcement of the subpoenas directed to Williams and Ehrlich, an order requiring return of documents already produced by Williams in response to a previous subpoena (the "equitable replevin" claim), and a declaratory judgment that the subpoena power conferred on the Committee by the Act is invalid and that all subpoenas issued and served pursuant thereto are unenforceable. On motion of the Committee, the district court (Wilkins, J., sitting by designation) dismissed the complaint for lack of subject matter jurisdiction, observing,
 
 
 14
 The Act clearly confers authority to issue subpoenas only on the clerk of the court of appeals. Section 372(c)(9)(A) provides the Committee with full subpoena powers "as provided in Section 332(d) of this title". Section 332(d)(1) provides: "each council is authorized to hold hearings, to take sworn testimony, and to issue subpoenas and subpoenas duces tecum. Subpoenas and subpoenas duces tecum shall be issued by the clerk of the court of appeals, at the direction of the chief judge of the circuit...." No other court is granted this authority specifically or implicitly. The court of appeals being the issuing body, it is therefore the only appropriate authority which has jurisdiction to enforce or invalidate its subpoenas. A district court is without jurisdiction to entertain challenges to subpoenas issued pursuant to the Act without a specific reference from the court of appeals.
 
 
 15
 In the alternative, the district court also evaluated the merits of appellants' claims and held the subpoenas to be valid and enforceable. Judge Hastings, Williams and Ehrlich now appeal from the district court's dismissal of their complaint.
 
 
 16
 II. THIS COURT'S JURISDICTION TO ENFORCE OR QUASH SUBPOENAS ISSUED IN THE COURSE OF AN INVESTIGATION UNDER THE ACT
 
 
 17
 Appellants contend that this court lacks subject matter jurisdiction to enforce or quash the Committee's subpoenas as an original matter. They rely on the proposition that, since original federal jurisdiction ordinarily is vested in the district courts pursuant to 28 U.S.C. Sec. 1331, no expansion of the limited original jurisdiction of the courts of appeals should be found absent an express congressional provision therefor. Such an express provision, they assert, is lacking here.
 
 
 18
 Section 332(d)(1), specifically made applicable to the Committee's subpoenas by section 372(c)(9)(A), provides as follows:
 
 
 19
 Each council is authorized ... to issue subpoenas and subpoenas duces tecum. Subpoenas and subpoenas duces tecum shall be issued by the clerk of the court of appeals, at the direction of the chief judge of the circuit or his designee and under the seal of the court, and shall be served in the manner provided in rule 45(c) of the Federal Rules of Civil Procedure for subpoenas and subpoenas duces tecum issued on behalf of the United States or an officer or agency thereof.
 
 
 20
 Although the Committee's subpoenas were indeed "issued by the clerk of the court of appeals ... under the seal of the court," 28 U.S.C. Sec. 332(d)(1), appellants argue that the affixing of the court seal was for purposes of authentication only and was not intended to denote use of the process of the court of appeals. They contend that the mere presence of the seal does not imply that the jurisdiction of the court of appeals can be invoked to enforce Committee subpoenas.
 
 
 21
 Appellants liken the present subpoenas to subpoenas issued by federal administrative agencies pursuant to any of the federal statutes that grant agencies subpoena power. See, e.g., 12 U.S.C. Sec. 1818(n) (Federal Deposit Insurance Corp.); 15 U.S.C. Sec. 49 (Federal Trade Commission); 29 U.S.C. Sec. 161 (National Labor Relations Board); 47 U.S.C. Sec. 409(e)-(g) (Federal Communications Commission). These statutes empower the agency to issue a subpoena under its own name and authority. The agency cannot, however, itself impose sanctions against a witness who will not comply. Instead, the statute authorizes the agency to petition the district court for an order enforcing the subpoena. Violation of such a district court order then is punishable as a contempt of the district court. Only at that stage has the witness defied the process of the district court itself.
 
 
 22
 Under this analogy, the present subpoenas would be without force of their own, and a failure to comply with them would not implicate the process of this court. To enforce the subpoenas, the Committee would first have to secure a separate enforcement order from a court. Appellants urge that the proper tribunal to issue such an order is the district court, since the statutes pertaining to administrative subpoenas commonly provide for their enforcement in that court. Upon disobedience of that order, contempt proceedings could be brought in the district court.
 
 
 23
 We do not agree with appellants' analogy. The agency subpoena statutes to which the purported analogy is drawn specifically designate the district court as the tribunal where enforcement is to occur. See, e.g., 12 U.S.C. Sec. 1818(n); 15 U.S.C. Sec. 49; 29 U.S.C. Sec. 161(2); 47 U.S.C. Sec. 409(g). The Act, in contrast, contains no hint of language directing enforcement in a district court. Rather, the pattern and wording of 28 U.S.C. Sec. 332(d)(1) are such as to suggest that Congress intended a court of appeals, as the tribunal which issued the subpoena, to determine a motion to enforce or quash a subpoena issued at the instance of the circuit's investigating committee.
 
 
 24
 In reaching this conclusion, we are influenced by the fact that section 332(d)(1) is structured much like the provisions governing subpoena issuance and enforcement in civil litigation under Fed.R.Civ.P. 45 and in criminal and grand jury matters under Fed.R.Crim.P. 17. Subpoenas issued under these two rules constitute process of the issuing court, and are enforced by that same court.
 
 
 25
 Fed.R.Civ.P. 45(a) provides,
 
 
 26
 For Attendance of Witnesses; Form; Issuance. Every subpoena shall be issued by the clerk under the seal of the court, shall state the name of the court and the title of the action, and shall command each person to whom it is directed to attend and give testimony at a time and place therein specified. The clerk shall issue a subpoena, or a subpoena for the production of documentary evidence, signed and sealed but otherwise in blank to a party requesting it, who shall fill it in before service.
 
 
 27
 Under this provision, a civil litigant may fill in and have served a subpoena issued by the clerk of the district court under the seal of that court. Bearing the court's seal and issued by its clerk, the subpoena is an instrument of that court's process. See In re Simon, 297 Fed. 942 (2d Cir.1924); 9 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2451, at 420 (1971). See also 28 U.S.C. Sec. 1691. If a witness disregards the subpoena and fails to comply without filing a timely motion to quash, the witness may be found in contempt of court, with no need for any further court order. Pennwalt Corp. v. Durand-Wayland, Inc., 708 F.2d 492, 494 n. 5 (9th Cir.1983); Ghandi v. Police Department of City of Detroit, 74 F.R.D. 115, 118 n. 4 (E.D.Mich.1977); Shawmut, Inc. v. American Viscose Corp., 11 F.R.D. 562 (S.D.N.Y.1951); Allen Bradley & Co. v. Local Union No. 3, 29 F.Supp. 759, 761 (S.D.N.Y.1939); 9 C. Wright & A. Miller, Sec. 2462, at 449-50; 5A Moore's Federal Practice p 45.03, at 45-20 to -21 (1985). The subpoena is enforceable in the court which issued it, under Fed.R.Civ.P. 45(f), which states, "Failure by any person without adequate excuse to obey a subpoena served upon him may be deemed a contempt of the court from which the subpoena issued."
 
 
 28
 Fed.R.Crim.P. 17(a) is virtually identical in all relevant respects. It provides,
 
 
 29
 For Attendance of Witnesses; Form; Issuance. A subpoena shall be issued by the clerk under the seal of the court. It shall state the name of the court and the title, if any, of the proceeding, and shall command each person to whom it is directed to attend and give testimony at the time and place specified therein. The clerk shall issue a subpoena, signed and sealed but otherwise in blank to a party requesting it, who shall fill in the blanks before it is served. A subpoena shall be issued by a United States magistrate in a proceeding before him, but it need not be under the seal of the court.
 
 
 30
 Under this Rule, too,
 
 
 31
 Failure by any person without adequate excuse to obey a subpoena served upon him may be deemed a contempt of the court from which the subpoena issued or of the court for the district in which it issued if it was issued by a United States magistrate.
 
 
 32
 Id., 17(g). As the above-quoted text makes clear, the subpoena enforcement mechanism applicable to subpoenas issued under the seal of the court pursuant to Fed.R.Crim.P. 17(a) is essentially the same as that applied to subpoenas issued pursuant to Fed.R.Civ.P. 45(a). See United States v. Partin, 552 F.2d 621, 630 n. 9 (5th Cir.), cert. denied, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977); 8 Moore's Federal Practice p 17.01, at 17-4; p 17.10-.11 (1984). See also Nixon v. Sirica, 487 F.2d 700, 709-10 (D.C.Cir.1973) ("A subpoena duces tecum is an order to produce documents or to show cause why they need not be produced. An order to comply does not make the subpoena more compulsory; it simply maintains its original force.").
 
 
 33
 Like subpoenas issued under the above two rules, the subpoenas issued here were directed by the Act to be "issued by the clerk ... under the seal of the court." And, reinforcing the parallel to Fed.R.Civ.P. 45, section 332(d)(1) goes on to provide that such subpoenas "shall be served in the manner provided in rule 45(c) of the Federal Rules of Civil Procedure for subpoenas or subpoenas duces tecum issued on behalf of the United States or an officer or agency thereof." See also Rule 11 of the Eleventh Circuit Rules for the Conduct of Complaint Proceedings Under 28 U.S.C. Sec. 372(c) ("Subpoenas shall be enforced as provided in Rule 45(f)" of the Federal Rules of Civil Procedure, which states, "Failure by any person without adequate excuse to obey a subpoena served upon him may be deemed a contempt of the court from which the subpoena issued (emphasis added).").
 
 
 34
 Given the similarity in choice of language, we believe that Congress was legislating in the Act against the backdrop of the similar Federal Rules of Civil Procedure and Federal Rules of Criminal Procedure provisions.[5] Under those rules, the seal of the court of appeals serves not merely to "authenticate" the subpoena in the eyes of the person served, but to carry with it the court's authority. Once that authority is invoked by service of the subpoena, the court under whose seal the subpoena was issued must have jurisdiction to enforce its subpoena and vindicate its own process, as Fed.R.Civ.P. 45(f) and Fed.R.Crim.P. 17(g) recognize. The courts of appeals cannot be deemed powerless to protect the integrity of their process. See 28 U.S.C. Sec. 1651(a) (the All Writs Act) ("all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions"); 18 U.S.C. Sec. 401 (conferring criminal contempt power on a federal court to punish "[d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command"); 28 U.S.C. Sec. 1826 (conferring civil contempt power on federal courts). See also Olson Rug Co. v. NLRB, 291 F.2d 655, 659 (7th Cir.1961) (court of appeals has power to issue and enforce subpoenas in the course of an original contempt proceeding for violation of the court's decree enforcing an order of the NLRB); Bethlehem Shipbuilding Corp. v. NLRB, 120 F.2d 126 (1st Cir.1941) (same). Under this analysis, we find the terms of section 332(d)(1) sufficiently clear to confer original jurisdiction on this court to enforce judicial council subpoenas issued under its seal. See In re Petition to Inspect and Copy Grand Jury Materials, 735 F.2d at 1266.[6]
 
 
 35
 By the same token, we think the jurisdiction of the courts of appeals to enforce judicial council subpoenas is exclusive. There is nothing in the Act to suggest concurrent enforcement jurisdiction in both the courts of appeals and the district courts. Nor is this court aware of any precedent for such a concurrent arrangement, or for the novel proposition that the district court may assert jurisdiction to enforce or quash subpoenas issued by another court.
 
 
 36
 Concurrent jurisdiction always raises the specter of forum shopping. In this context it would also raise two special problems. First, it would create a situation in which a trial court rules on the validity of conduct authorized through an appellate court. Second, jurisdiction would be not only concurrent, but simultaneous in several courts. One witness could bring his motion to quash in the court of appeals. Others could select the district court in which they resided, presumably even in another circuit, with the possibility of appeals to a number of courts of appeals. Only one formulation necessarily leads to all challenges being heard by the same court: review in the court of appeals under whose seal the subpoena was issued. Given these considerations, we are disinclined to find concurrent jurisdiction absent express congressional authorization.
 
 
 37
 In urging a different result, appellants point to Fed.R.Civ.P. 81(a)(3), which provides,
 
 
 38
 These rules apply to proceedings to compel the giving of testimony or production of documents in accordance with a subpoena issued by an officer or agency of the United States under any statute of the United States except as otherwise provided by statute or by rules of the district court or by order of the court in the proceedings.
 
 
 39
 (Emphasis added.) They argue that judicial council subpoenas are issued by a federal officer or agency under federal statute and, accordingly, under this Rule should be enforced in the district courts pursuant to Fed.R.Civ.P. 45. Appellants overlook the fact that a judicial council or investigating committee is hardly a federal "agency" as commonly understood. See In re Petition to Inspect and Copy Grand Jury Materials, 735 F.2d at 1271-72. Moreover, since section 332(d)(1) specifically points toward a different locus of enforcement, one "otherwise provided by statute," we consider Rule 81(a)(3) inapplicable. In any event, although the Federal Rules of Civil Procedure govern proceedings in the district courts, they are not jurisdictional provisions and do not prescribe which proceedings are to be brought in the district courts. See Fed.R.Civ.P. 82 ("These rules shall not be construed to extend or limit the jurisdiction of the United States district courts...."). Similarly, 28 U.S.C. Sec. 372(c)(16), which provides,
 
 
 40
 Except as expressly provided in this subsection, nothing in this subsection shall be construed to affect any other provision of this title, the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, the Federal Rules of Appellate Procedure, or the Federal Rules of Evidence,in no way suggests that judicial council subpoenas are to be enforced in the district courts pursuant to the Federal Rules of Civil Procedure, but merely notes that the Act should not be construed, in the absence of an express provision, to affect those Rules in the contexts in which they do apply.
 
 
 41
 We recognize that judicial council subpoenas are issued by the clerk "at the direction of the chief judge of the circuit or his designee," 28 U.S.C. Sec. 332(d)(1), and that the Committee's subpoenas at issue here were signed not only by the clerk but by the Chief Judge of the Eleventh Circuit. Appellants suggest that these facts show that these are administrative subpoenas. But the Chief Judge's directory role in issuing a judicial council subpoena under section 332(d)(1) is little different from that of a litigant who is permitted by Fed.R.Civ.P. 45 or Fed.R.Crim.P. 17 to obtain a subpoena, issued in blank by the clerk under the seal of the district court, and, after filling it in, to have it served. In directing the issuance of the subpoena, the Chief Judge acts simply as the presiding member of the judicial council, not in a judicial capacity.[7] Like subpoenas issued under Fed.R.Civ.P. 45 and Fed.R.Crim.P. 17, the Committee's subpoena when served has yet to be adjudicated in respect to its validity and enforceability. Yet like those other subpoenas, it too bears the seal of the court, and thus carries with it, if in a preliminary way, the mandate of the court of appeals.
 
 
 42
 We recognize that this holding means that courts of appeals may be involved in original factfinding proceedings which they are institutionally ill-equipped to handle. Although courts of appeals long have exercised original jurisdiction in limited contexts, e.g., in contempt proceedings for violation of decrees enforcing orders of the NLRB, see, e.g., Olson Rug Co., 291 F.2d at 659; Bethlehem Shipbuilding Corp., 120 F.2d 126, it is likely true, as appellants argue, that the district courts are better geared to determine original subpoena enforcement actions. However, we must defer to Congress's choice, and we can see a number of factors supporting Congress's decision to confer original jurisdiction on the courts of appeals despite the undoubted problems involved.
 
 
 43
 The Act's goals of maintaining public confidence in the judiciary and promoting the effective administration of justice require that investigations into alleged judicial misconduct be concluded as expeditiously as is reasonably possible, lest a sitting Article III judge be compelled to function under a cloud of doubt and suspicion for any longer than is absolutely necessary. Congress gave effect to the need for speed by directing that each investigating committee file its report "expeditiously," 28 U.S.C. Sec. 372(c)(5), and by precluding judicial review of orders and determinations made in the course of investigations under the Act. 28 U.S.C. Sec. 372(c)(10). Assigning subpoena enforcement authority to the courts of appeals, similarly, promotes expedition in that it eliminates an entire layer of potential appeals from original subpoena enforcement determinations. See also Trans-Alaska Pipeline Authorization Act, 43 U.S.C. Sec. 1652(d) (review of district court orders relating to construction of Alaskan pipeline system "may be had only upon direct appeal to the Supreme Court of the United States"); Alyeska Pipeline Service Co. v. United States, 624 F.2d 1005, 1009, 224 Ct.Cl. 240 (1980) (the intent of 43 U.S.C. Sec. 1652(d) "was to limit litigation that would further delay construction of the pipeline").
 
 
 44
 It is a safer assumption, moreover, that the witnesses in council or investigatory proceedings will be found within the circuit than within any one district. Congress may have sought to ensure that all or most disputes arising from the issuance of subpoenas in the course of an investigation would be determined in the same court in the first instance. Such an arrangement also promotes expedition by concentrating all subpoena questions in a single deciding body (which will gain increasing familiarity with the background of the matter) and by avoiding dispersion of such questions among a number of courts at both the trial and appellate levels, as might occur if the district courts had original jurisdiction. And while exercising subpoena enforcement jurisdiction under the Act will inject the courts of appeals into an unfamiliar fact-finding role, courts of appeals possess inherent authority to appoint a special master--who could, it seems, be a sitting Article III judge if this were desirable--to assist them in the fact-finding process. Ex Parte Peterson, 253 U.S. 300, 312-13, 40 S.Ct. 543, 547, 64 L.Ed. 919 (1920). See United States v. Raddatz, 447 U.S. 667, 683 n. 11, 100 S.Ct. 2406, 2416 n. 11, 65 L.Ed.2d 424 (1980); United States v. Charmer Industries, Inc., 722 F.2d 1073 (2d Cir.1983) (district court judge appointed as special master by Second Circuit Court of Appeals); Union Electric Co. v. Environmental Protection Agency, 515 F.2d 206, 211 n. 19 (8th Cir.1975), aff'd, 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976); Olson Rug Co., 291 F.2d at 659.
 
 
 45
 As a consequence of our holding that this court possesses exclusive original jurisdiction to enforce or quash subpoenas issued under section 332(d)(1), we affirm the district court's dismissal of appellants' complaint below for lack of subject matter jurisdiction, except that we affirm the district court's dismissal of appellants' equitable replevin claim on its merits.[8] We now proceed to exercise our original jurisdiction to determine the Committee's motions to enforce the subpoenas directed to Williams, Ehrlich, Simons, and Miller and the motions to quash subpoenas filed by Williams, Ehrlich, and Simons.[9]
 
 
 46
 III. CONSTITUTIONAL OBJECTIONS TO THE COMMITTEE'S EXERCISE OF THE SUBPOENA POWER
 
 
 47
 Appellants contend that the Committee's subpoenas cannot be enforced because the subpoena provisions of the Act, and many of the Act's other features as well, violate the constitutional scheme of separation of powers and other constitutional principles.
 
 
 48
 Judge Hastings raised similar issues in a lawsuit he instituted in the United States District Court for the District of Columbia to enjoin the Committee's investigation on constitutional grounds. The district court in Hastings v. Judicial Conference of the United States, 593 F.Supp. 1371 (D.D.C.1984), upheld the constitutionality of the Act and dismissed Judge Hastings' complaint. Last summer, however, the District of Columbia Circuit, in Hastings v. Judicial Conference of the United States, 770 F.2d 1093 (D.C.Cir.1985), vacated the district court's judgment and remanded for dismissal without prejudice. It ruled that the district court's adjudication of the facial constitutionality of the Act was premature because the Committee's then-inchoate proceedings had not yet advanced to the stage where ripe constitutional issues would be presented with adequate development of the facts.
 
 
 49
 After the District of Columbia Circuit handed down its opinion, we directed the parties to file supplemental briefs discussing the extent to which, in light of the District of Columbia Circuit's reasoning, it would be proper for us to address the same constitutional issues in these subpoena enforcement proceedings. In addition to these supplemental briefs, the parties have tendered to us copies of their briefs filed in the District of Columbia Circuit. The United States has also intervened and filed its own brief in support of the Act's constitutionality.
 
 
 50
 As the foregoing account suggests, we now face a plethora of constitutional and related procedural issues. Not only is the constitutionality of the Act itself attacked in all its aspects, but because appellants are merely subpoenaed witnesses and not the subject of the investigation, there is the question of their standing to launch such attacks, as well as further questions concerning whether it is still premature to address some of the constitutional issues.
 
 
 51
 In Section A, below, we address appellants' standing, concluding that they do have standing to challenge the Act's constitutionality on some grounds.
 
 
 52
 In Section B, we deal with the various constitutional claims, disposing of some of them in favor of the Act and declining to address certain others because premature, because not amenable to resolution in a suit brought by subpoenaed witnesses, or for other reasons.
 
 A. Standing
 
 53
 The United States contends that since the appellants are mere subpoenaed witnesses they lack standing to challenge the constitutionality of the Act. The government points out that Judge Hastings himself is not a party to the original subpoena enforcement proceedings; his motion to intervene in those proceedings, filed on September 25, 1985, three months after oral argument, was denied by us as untimely. While Judge Hastings is a party to the appeal from the district court, he has expressly declined to press the constitutional claims raised before the district court. The government insists, therefore, that the only parties raising constitutional claims--the subpoenaed witnesses--have not demonstrated the distinct and palpable injury to themselves that must be present or threatened under Article III for this court to exercise its powers of adjudication.
 
 
 54
 In support of the above argument the government relies upon Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979 (1919), and related cases. In Blair the Supreme Court held that witnesses subpoenaed by a grand jury investigating alleged violations of the Federal Corrupt Practices Act could not refuse to testify or produce documents on the ground that the Act was unconstitutional. The Court found that the witnesses lacked standing to press that claim, reasoning,
 
 
 55
 Considerations of propriety, as well as long-established practice, demand that we refrain from passing upon the constitutionality of an act of Congress unless obliged to do so in the proper performance of our judicial function, when the question is raised by a party whose interests entitle him to raise it.
 
 
 56
 We do not think the present parties are so entitled, since a brief consideration of the relation of a witness to the proceeding in which he is called will suffice to show that he is not interested to challenge the jurisdiction of court or grand jury over the subject-matter that is under inquiry.
 
 
 57
 * * *
 
 
 58
 [T]he giving of testimony and the attendance upon court or grand jury in order to testify are public duties which every person within the jurisdiction of the Government is bound to perform upon being properly summoned....
 
 
 59
 * * *
 
 
 60
 On familiar principles, [a witness] is not entitled to challenge the authority of the court or of the grand jury, provided they have a de facto existence and organization.
 
 
 61
 [A witness] is not entitled to set limits to the investigation that the grand jury may conduct.
 
 
 62
 * * *[A]ppellants were not entitled to raise any question about the constitutionality of the statutes under which the grand jury's investigation was conducted.
 
 
 63
 Id. at 279, 281-83, 39 S.Ct. at 470-71. See also In re Fula, 672 F.2d 279, 283 (2d Cir.1982); Federal Trade Commission v. Ernstthal, 607 F.2d 488 (D.C.Cir.1979).
 
 
 64
 For similar reasons, the government urges, appellants here lack any cognizable interest in resolving the issue of the constitutionality of the Act. They may not, therefore, challenge the Committee's subpoenas on constitutional grounds, but only on grounds--e.g., privilege or burdensomeness--closely related to their individual interests.
 
 
 65
 The government's argument in this regard is bolstered by the rule in United States v. Morton Salt Co., 338 U.S. 632, 652, 70 S.Ct. 357, 368, 94 L.Ed. 401 (1950), and its progeny, that an administrative subpoena issued for a lawfully authorized purpose, not too indefinite, and seeking relevant information cannot be challenged on grounds that the investigation is beyond the agency's jurisdiction or is in aid of invalid agency regulations. See, e.g., United States v. Empire Gas Corp., 547 F.2d 1147 (Temp.Em.Ct.App.1976), cert. denied, 430 U.S. 915, 97 S.Ct. 1326, 51 L.Ed.2d 592 (1977); United States v. Feaster, 376 F.2d 147 (5th Cir.1967).
 
 
 66
 But while Blair, Morton Salt and related cases lend considerable impetus to the government's insistence that we avoid deciding appellants' constitutional challenges, there are significant differences between these authorities and the current case.
 
 
 67
 First, the witnesses now seeking to dispute the Act's constitutionality are or were members of Judge Hastings' chambers staff; in declining to testify as to communications between themselves and Judge Hastings, they are invoking a privilege held by Judge Hastings himself.[10] While their own private interests might not confer standing to object to the Act's constitutionality, these witnesses arguably possess a kind of surrogate standing, derived from Judge Hastings' judicial privilege upon which their enforced testimony may impinge. See note 10, supra. Judge Hastings undoubtedly supports these witnesses' refusal to testify; he may well have requested them to take that position on his behalf. It is his own attorney, representing two of the four witnesses, who has pressed these constitutional claims before us. It seems only reasonable that we should decide whether the very existence of the Committee for its assigned purpose violates the Constitution, before allowing the Committee to intrude upon confidential communications between the judge and his staff.
 
 
 68
 Secondly, appellants--unlike the witnesses in Blair and similar cases--do not merely challenge the constitutionality of the Committee's particular investigation of Judge Hastings. More fundamentally, they call into question the constitutional legitimacy of the investigating committee itself, arguing that the Constitution forbids Congress from empowering a judicial council to investigate a sitting Article III judge. No such argument was made in Blair concerning the power and legitimacy of the grand jury, nor could it have been in view of the express constitutional status and long history of the grand jury as an institution. The Blair grand jury plainly had the authority to investigate and to subpoena witnesses whatever the force of appellants' argument that the statutory crimes for which the target was being investigated were unconstitutional. Here, by contrast, appellants assert that the very Committee investigating the complaint against Judge Hastings, and its parent judicial council, contravene basic constitutional principles and have no proper existence whatever. See also In re Application of the President's Commission on Organized Crime (Subpoena of Lorenzo Scaduto ), 763 F.2d 1191 (11th Cir.1985) (without discussion, subpoenaed witness before President's Commission on Organized Crime permitted to challenge inclusion of federal judges on Commission on separation of powers grounds). Cf. United States v. Criminal Court of the City of New York, 442 F.2d 611, 615 n. 7 (2d Cir.), cert. denied, 404 U.S. 856, 92 S.Ct. 111, 30 L.Ed.2d 98 (1971); but cf. In re Archuleta, 561 F.2d 1059, 1063 (2d Cir.1977); In re Maury Santiago, 533 F.2d 727, 730 (1st Cir.1976).
 
 
 69
 The above reasons persuade us that at least some of appellants' constitutional challenges--those going to the existence and investigatory authority of the Committee--can be interposed in this proceeding, as an exception to the general rule in Blair and in the Morton Salt line of cases. We observe, in respect to the latter, that courts have been more willing to look behind an administrative subpoena where the subpoena seeks to investigate matters of substantial constitutional significance, such as communications allegedly protected by a constitutionally based privilege.[11] See Federal Election Commission v. Florida for Kennedy Committee, 681 F.2d 1281, 1284-85 (11th Cir.1982) (despite Morton Salt, court must closely scrutinize agency's authority to investigate where subpoena may infringe upon first amendment associational rights); United States v. University Hospital, 729 F.2d 144, 150 (2d Cir.1984) (court must take particular care to assure itself that investigation is within agency's authority where subpoena arguably implicates constitutionally protected rights); Federal Election Commission v. Machinists Non-Partisan Political League, 655 F.2d 380, 386-88 (D.C.Cir.), cert. denied, 454 U.S. 897, 102 S.Ct. 397, 70 L.Ed.2d 213 (1981) (especially careful judicial scrutiny of agency's authority to investigate is appropriate where subpoena demands "delicate" materials concerning a political group's internal communications, may infringe on first amendment associational rights, and is issued by an agency which cannot investigate out of mere "official curiosity," but only pursuant to the filing of a complaint).
 
 
 70
 While the answer is not free from doubt, we conclude that we can and should address at least some of the constitutional questions raised by appellants, in particular those immediately relevant to the authority of the Committee and judicial council to pursue an investigation of the present type. We turn now, therefore, to the constitutional issues which appellants have presented. We conclude that, even if appellants have standing, their constitutional contentions either fail on the merits or are unsuitable for decision in this proceeding.
 
 B. The Constitutional Issues
 
 71
 Appellants' constitutional attacks upon the Act can be summarized as follows:
 
 
 72
 (1) The Act impermissibly assigns executive powers, including the subpoena power, to judicial officers.
 
 
 73
 (2) The investigatory scheme established by the Act unconstitutionally intrudes upon the independence of sitting Article III judges to engage in free and uninhibited decisionmaking.
 
 
 74
 (3) The authority given to the judicial branch to certify that grounds for impeachment may exist is inconsistent with the sole power of the House of Representatives to initiate impeachment proceedings.
 
 
 75
 (4) The Act's standards of judicial misconduct are unconstitutionally vague and overbroad.
 
 
 76
 (5) The Act violates the due process rights of judges under investigation in that it denies the accused judge the right to confront the evidence against him and impermissibly combines investigatory/prosecutorial and adjudicatory functions in the judicial council.
 
 
 77
 The District of Columbia Circuit in Hastings, 770 F.2d 1093, a declaratory judgment action brought by Judge Hastings himself, declined to adjudicate any of the above constitutional claims on the ground that Judge Hastings had not yet been exposed to injury. The court noted, however, "[A]ppellant has available his constitutional challenge to the validity of provisions of the Act in every one of the situations in which he is exposed to the threat of injury. Thus, he may interpose his constitutional arguments, e.g., as a defense to a subpoena...." Hastings, 770 F.2d at 1102. Except that the present subpoena action involves primarily witnesses, not Judge Hastings himself, it is of the kind that the District of Columbia Circuit seems to have had in mind. We agree that some--though not all--of the above constitutional claims are ripe for decision in this proceeding.
 
 
 78
 The claims we find ripe are those that bear directly on whether the present, still incomplete, investigation is valid--for example, those going to whether empowering a committee of judges to investigate a complaint against a colleague violates the Constitution. See, e.g., subsections (1), (2) and (3), infra. We would be reluctant to enforce these subpoenas if there were some fundamental constitutional principle which prevented a committee or judicial council from conducting this type of investigation of a sitting judge under any circumstances.
 
 
 79
 We distinguish between constitutional questions going to the Committee's present right to investigate at all, and other constitutional issues that may lurk further down the road. For example, appellants challenge the provision in the Act which, after completion of an investigation, authorizes a judicial council to prevent a judge temporarily from being assigned further cases. 28 U.S.C. Sec. 372(c)(6)(B)(iv). We do not think the hypothetical unconstitutionality of this provision would be a proper defense in the current enforcement proceeding. The Judicial Council of the Eleventh Circuit has had no occasion to invoke it, and, depending on the result of the investigation, may never do so. Even if it were unconstitutional, as Judge Edwards suggests in his concurring opinion in Hastings, 770 F.2d at 1107-09, this fact would not necessarily defeat the Committee's present power to investigate, since the judicial council has many other courses of action open to it after the investigation ends, some of which seem plainly lawful. See subsection (2), infra. Offending provisions of the Act, if any, may be severable. Thus, as we further explain below in our discussion of the different constitutional arguments, there are certain aspects of the Act on which we think it inappropriate to pass constitutional judgment in this proceeding.
 
 
 80
 We now take up in some detail the constitutional contentions listed at the beginning of this subsection, following the order set out there.
 
 
 81
 (1) Appellants' claim that the Act impermissibly assigns executive powers, including the subpoena power, to judicial officers.
 
 
 82
 Appellants argue that the investigatory powers assigned by Congress to the Committee, including its subpoena power, are "executive," hence not exercisable within the judicial branch. This argument seems to imply that judges are limited to doing little else except deciding cases. To the extent they spend time, and make decisions, in internal court management and related investigatory functions they are performing forbidden "executive branch" activities. We can see little merit in this bald proposition.
 
 
 83
 Appellants support their argument by reference to a recent decision of this circuit, In re Application of the President's Commission on Organized Crime (Subpoena of Lorenzo Scaduto), 763 F.2d 1191 (11th Cir.1985). A majority of the Scaduto panel held that Article III judges violated separation of powers principles when, along with non-judges, they served as members of the President's Commission on Organized Crime. Scaduto, however, involved service by judges on a commission with objectives--fighting organized crime--that lay outside the judiciary, falling within the ambit of typical executive branch activities. The panel felt that the judges were not only performing a task outside the judicial branch, but, even worse, were doing work that would erode the impartial outlook expected of them when performing their normal judicial duties.
 
 
 84
 The Act, on the contrary, does not ask judges to promote some interest lying outside the immediate concerns of the judicial branch, nor does their membership on investigating committees and judicial councils make them less impartial, in the way that crime-fighting might make judges partial to the prosecution when presiding over criminal trials. Under the Act, an investigating committee is to investigate complaints (not already dismissed by the Chief Judge as frivolous or related to the merits of a ruling) against judges and magistrates who are accused of engaging
 
 
 85
 in conduct prejudicial to the effective and expeditious administration of the business of the courts.
 
 
 86
 28 U.S.C. Sec. 372(c)(1). The Committee is also to investigate complaints alleging a judge's or a magistrate's inability to discharge the duties of office "by reason of mental or physical disability." Id. After the investigation is complete, the judicial council
 
 
 87
 shall take such action as is appropriate to assure the effective and expeditious administration of the business of the courts within the circuit, including, but not limited to, any of the following actions....
 
 
 88
 28 U.S.C. Sec. 372(c)(6)(B).[12] Thus, unlike the President's Commission on Organized Crime, which recommended law enforcement legislation and also various executive measures to the President and Attorney General, the investigating judges here are concerned solely with matters affecting the management and reputation of the judiciary itself.
 
 
 89
 We know of no authority for the proposition that courts' administrative and investigatory activities, limited to consideration of their own conduct and efficiency, are to be labelled as "executive" simply because non-adjudicative in character. Under Article III, the judicial power is invested in one Supreme Court "and in such inferior Courts as the Congress may from time to time ordain and establish." Pursuant to its latter power to ordain and establish the inferior courts, Congress has enacted many laws placing administrative duties on judges and supporting personnel in the judicial branch. For example, a chief judge of a circuit court is empowered to designate judges to sit in different courts within the circuit, 28 U.S.C. Sec. 292(b), and, in recent times, circuit councils and circuit executives have been granted a variety of powers. 28 U.S.C. Sec. 332. Chief judges, circuit councils, court executives and clerks of court all hold, by law, specified court management responsibilities, the exercise of which are presumably believed by Congress to be "necessary and proper," Art. I, Sec. 8, in order to "ordain and establish" those inferior courts sharing in the "judicial power" under Article III.
 
 
 90
 In Chandler v. Judicial Council, 398 U.S. 74, 90 S.Ct. 1648, 26 L.Ed.2d 100 (1970), decided before the enactment of the Act, the Supreme Court, speaking through Chief Justice Burger, recognized with apparent approval that Congress had granted "some management power" to a circuit council, id. at 85, 90 S.Ct. at 1654, which it described as "an administrative body functioning in a very limited area." Id. at 86 n. 7, 90 S.Ct. at 1654 n. 7. The Court similarly commented that the lower courts might adopt rules and reasonable procedures binding on their members, and that the "extraordinary machinery of impeachment" was not the only recourse should a judge refuse to abide by these. Id. at 85, 90 S.Ct. at 1654. In a footnote, the Chandler Court stated,
 
 
 91
 We see no constitutional obstacle preventing Congress from vesting in the Circuit Judicial Councils, as administrative bodies, authority to make 'all necessary orders for the effective and expeditious administration of the business of the courts within [each] circuit.'
 
 
 92
 Id. at 86 n. 7, 90 S.Ct. at 1654 n. 7. The same above-quoted "all necessary" language was repeated by Congress in the present Act when defining broadly the kind of remedial action a judicial council might take after investigation of a judicial complaint. 28 U.S.C. Sec. 372(c)(6)(B).
 
 
 93
 The Chandler Court, to be sure, drew back from attempting to define the permissible extent of a circuit council's administrative powers. Thus it never ruled expressly whether Judge Chandler's colleagues went too far in refusing to assign him further cases until he had coped with his backlog. The Supreme Court also made it plain that court management powers exercised by a judge's colleagues could be unconstitutional if they amounted to an undue burden upon the independence of an individual judge. See subsection (2), infra. Nonetheless the Court indicated that for "a complex judicial system [to] function efficiently," judges are entitled to some degree of "statutory framework and power whereby they might 'put their own house in order.' " Id. at 85, 90 S.Ct. at 1654.
 
 
 94
 We read Chandler as rejecting any fixed notion, such as appellants now propound, that courts are mere collections of individual judges, each of whom is a complete law unto himself or herself. Two of the justices who participated in Chandler, Douglas and Black, did indeed take this view, but in dissent. Id. at 136, 90 S.Ct. at 1680 (Douglas, J., dissenting). The majority in Chandler indicated that there was no constitutional obstacle to the broadly worded grant of authority to judicial councils, and that the judges of a court could take reasonable management actions affecting all judges provided they were not violative of each judge's essential independence in respect to decision-making. It follows that judges are not limited to just bench-sitting, and do not violate separation of powers principles when they participate in ancillary court management tasks.
 
 
 95
 At bottom, whether investigatory chores, such as issuance of a subpoena, belong in the judicial branch does not turn on a simple description of job characteristics. After all, the job functions in a clerk of court's office are not a great deal different from those performed in other branches of government. By the same token, the current investigation has similarities to investigations performed by federal executive agencies. This, however, is immaterial. The critical point is that the investigatory tasks at issue here, including the subpoena power, have the sole purpose of exploring complaints against federal judges and magistrates, with the ultimate aim of promoting "the effective and expeditious administration of the business of the courts." Functions so limited in scope and purpose may or may not be constitutional in other respects, but they do not fall outside the ambit of duties assignable to members of the judicial rather than of another branch.
 
 
 96
 Our analysis is now complete for purposes of the present section, which merely addresses the argument that the Committee's investigatory and subpoena powers are inherently "executive." In the next section we discuss the more difficult issue whether the Act's judicial complaint provisions are the kind of administrative enactments that are forbidden because they go too far in permitting a judge's colleagues to intrude upon his or her constitutionally-guaranteed independence. Here, we hold only that the judicial complaint procedures, being ancillary to the administration of the courts, are duties which the Congress could properly confer upon the judicial rather than the executive branch. Indeed, we think that far more serious separation of powers objections would have arisen had these same powers been conferred upon a permanent agency in the executive (or legislative) branch.[13]
 
 
 97
 (2) Appellants' claim that the investigatory scheme established by the Act unconstitutionally intrudes upon the independence of a sitting Article III judge.
 
 
 98
 The next and more difficult question is whether the judicial complaint procedure goes too far in curbing the independence of the judge who is the subject of the investigation.
 
 
 99
 The clearest form of this argument--which was adopted by both Justices Douglas and Black, dissenting, in Chandler, 398 U.S. at 129, 141, 90 S.Ct. at 1676, 1682--is that any kind of procedure which allows a judge's colleagues, for whatever reason, to impose any pressures and sanctions whatsoever on the judge violates the constitutional requirement that a judge can be removed only by impeachment.[14] While a judge, like everyone else, is subject to the normal strictures of the criminal and civil law, see United States v. Hastings, 681 F.2d 706 (11th Cir.1982), cert. denied, 459 U.S. 1203, 103 S.Ct. 1188, 75 L.Ed.2d 434 (1983); United States v. Isaacs, 493 F.2d 1124 (7th Cir.), cert. denied, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974), this argument contends that not only is his removal forbidden except by impeachment, but so, too, is any--even the slightest--diminution in his judicial power and status. It was pursuant to this line of argument that the two Chandler dissenters would have denied the right of a judicial council to suspend the assignment of new cases to a backlogged judge.
 
 
 100
 The answer to this argument lies in Chandler itself. As noted in the previous subsection, that position, endorsed by Justices Douglas and Black, appears only in dissent. The majority opinion, while exceedingly careful, clearly indicates that, in order for the judicial system to work, some reasonable measures, short of impeachment, tending to require judges to cooperate in respect to administration of their court are constitutional. Thus the Chief Justice wrote,
 
 
 101
 But if one judge in any system refuses to abide by such reasonable procedures it can hardly be that the extraordinary machinery of impeachment is the only recourse.
 
 
 102
 398 U.S. at 85, 90 S.Ct. at 1654. While Justice Douglas used the word "sovereign" to describe each federal judge, id. at 136, 90 S.Ct. at 1680 et seq., the majority asked,
 
 
 103
 [C]an each judge be an absolute monarch and yet have a complex judicial system function efficiently?
 
 
 104
 Id. at 85, 90 S.Ct. at 1654.
 
 
 105
 The key to the disagreement between the Chandler dissenters and the majority may well lie in the fact that whereas the dissenters saw the realm of judicial independence to be all-encompassing, the majority located a judge's protected independence, more narrowly, "in deciding cases or in any phase of the decisional function." The Court continued,
 
 
 106
 [I]t is quite another matter to say that each judge in a complex system shall be the absolute ruler of his manner of conducting judicial business.
 
 
 107
 Id. at 84, 90 S.Ct. at 1653.
 
 
 108
 We thus must reject the argument that the Act is unconstitutional because any measures which may place pressures on a judge constitute a form of removal from office by means other than by impeachment. While Chandler did not decide how far a judge's colleagues might be authorized to go in the pursuit of reasonable administrative and institutional goals, it did indicate that Congress had some leeway in this area.
 
 
 109
 Our above conclusion does not, of course, decide this case, although it does suggest the correct direction of our inquiry. The Chandler majority expressed utmost concern that each Article III judge receive the independence which the Constitution grants, especially, as we have noted, "in deciding cases or in any phase of the decisional function." We must, therefore, inquire whether such direct or indirect effects as the Act may have on an individual judge's independence are within proper tolerances.
 
 
 110
 We add that, for purposes of this subpoena enforcement proceeding, our inquiry need not be exhaustive, nor should we attempt to pass judgment upon every discrete issue of constitutionality to which the Act might give rise. It suffices to inquire whether the Act, facially and in broad design, is constitutional in respect to authorizing the current investigation, so that the subpoenas may be enforced with confidence that the Committee's investigatory proceedings are legitimate. We believe the current proceedings pass this kind of muster. In particular, we think the complaint procedure of which this investigation is a part is, in broad outline, reasonable and not overly threatening to judicial independence.
 
 
 111
 First, we believe that Congress could reasonably have determined that some internal procedure for investigating complaints against members of the judiciary was not only in the public interest but was important to the continued independence of the judiciary as a whole. Judges have very substantial powers and are supported at public expense. Today, some kind of complaint procedure exists with respect to state judges in every state in the union. The judiciary as a whole, including the colleagues of complained-against judges, has an interest in seeing that non-frivolous complaints are looked into, to the end that the judge, and the system he exemplifies, be exonerated or, if not, that the public perceive that the system has undertaken to police itself, within constitutional limits, of course. Absent any form of judicial complaint procedure, courts would be virtually alone among public and professional occupations in lacking a means to clean house. The increase in the number of judges coupled with the increase in the complexity of judicial work and of courts, all suggest that some mechanism for looking into complaints is necessary and reasonable, if only to enable the courts themselves to sort out their own shortcomings and make the necessary administrative adjustments.[15] In fact, a credible internal complaint procedure can be viewed as essential to maintaining the institutional independence of the courts. If judges cannot or will not keep their own house in order, pressures from the public and legislature might result in withdrawal of needed financial support or in the creation of investigatory mechanisms outside the judicial branch which, to a greater degree than the Act, would threaten judicial independence. Considerations of this sort were at the heart of the present legislation. For example, it was stated in Congress during debate on the Act that "strengthening the disciplinary powers of the circuit councils ... will ... minimize the constitutional problems involved in this sensitive area, while providing the least intrusion into the independence of the federal judiciary." 126 Cong.Rec. H8787 (1980) (statement of Rep. McClory). See also id. (statement of Rep. Rodino); id. at S13858-S13860 (statement of Sen. DeConcini).
 
 
 112
 Second, while the Act may impose some pressures upon judges' independence, the fact that it places the investigation, and the determination of what actions to take, entirely within the hands of judicial colleagues makes it likely that the rightful independence of the complained-against judge, especially in the area of decision-making, will be accorded maximum respect.[16] Because of their own experience, other judges can be expected to understand the demands unique to their profession; and as each is a decision-maker himself, these other judges may be expected to refrain from applying sanctions that could chill the investigated judge's freedom to decide cases as he sees fit, since such sanctions could be a precedent that could be turned against any judge. Above all, judges will certainly be reluctant to take any action that would predictably inhibit the free and independent functioning of the courts. We think it most unlikely that the members of an investigating committee and judicial council would be afflicted by any sort of parochialism and bias that would lead them to impose sanctions simply because a colleague was a "maverick" or a member of a minority group.
 
 
 113
 Third, many of the actions which a judicial council is authorized to take under the Act, see 28 U.S.C. Sec. 372(c)(6), depend upon the voluntary compliance of the judge. They are, therefore, not of a type which can powerfully interfere with a judge's independence.
 
 
 114
 For example, the option of certifying to a judge's mental or physical disability under 28 U.S.C. Sec. 372(b) (a procedure which can be used only against judges who have already reached retirement age) does not permit a judge to be retired against his will. 28 U.S.C. Sec. 372(c)(6)(B)(ii). Its main use is to permit the court to obtain the services of a perhaps badly needed additional judge.
 
 
 115
 Requesting that a judge retire is another action which a judicial council may undertake after looking into a complaint against a judge. 28 U.S.C. Sec. 372(c)(6)(B)(iii). The decision whether to retire is left entirely to the judge. Congress has empowered the council to offer the "carrot" of early retirement, but has not attempted to provide any improper "stick."[17]
 
 
 116
 Censure by private communication or public announcement is another set of alternatives specified in the Act. 28 U.S.C. Sec. 372(c)(6)(B)(v), (vi). The former seems clearly unobjectionable. Whether the latter goes too far is a matter we need not consider here, since even if it did, we do not think that by itself it would cause the whole process to fall. In any case, it would be premature for us to consider the constitutionality of a sanction which has yet to be invoked, especially since the nature and circumstances of the "public announcement" might be very relevant to the constitutional question.
 
 
 117
 Besides the above measures, all of which, except possibly the last, seem unobjectionable, there are other, unlisted options open to a judicial council, the constitutionality of which cannot be doubted. One would be to exonerate the judge completely. Another would be to issue a report which, without personal criticism of the judge, might reveal some institutional or administrative error, or some good faith mistake. Such an outcome, although less dramatic, might nonetheless be of significant future value to the court. The investigation might, in other words, lead to no sanction as such,[18] but nonetheless, by uncovering the truth, lift whatever cloud was being placed upon the judge or show the judge, or the court as an institution, how to avoid future difficulties of a similar type.[19]
 
 
 118
 None of the above outcomes, except conceivably the reprimand by public announcement, is likely to have any major impact upon judicial independence; at least they implicate no problems greater than is posed by collective judicial administration generally. Thus even assuming a group of judges were willing to misuse the complaint procedure to punish a fellow judge for views reflected in his decision-making, the above "sanctions" would be impotent to do more than such judges could do on their own by snubbing the "maverick" or publicly or privately criticizing him. Procedures under the Act are, moreover, confidential, thus normally reducing any stigma attached. 28 U.S.C. Sec. 372(c)(14). To be sure, final written orders implementing sanctions must be made public, and must be accompanied by written reasons "unless contrary to the interests of justice." 28 U.S.C. Sec. 372(c)(15). And the personal pressures (and sometimes the expense) of an investigation upon the complained-against judge may be great. Against this, however, must be balanced the institutional values, important to the independence of the judiciary as a whole, in having a credible process for the airing of complaints. Indeed, individual judges may also welcome a means of exoneration from malicious or otherwise unfair complaints.
 
 
 119
 We conclude that a judicial council's conferred power to take the above-discussed actions within the ambit of its responsibility for judicial governance, like its exercise of administrative and investigatory functions generally, does not transgress the Constitution's vision of the independence of each Article III judge. Nor do such narrow administrative measures intrude upon Congress's sole power of removal by impeachment. The judiciary could hardly function effectively if judicial councils were powerless to exercise powers of moral suasion or censure, where a judge is felt to be bringing discredit on the court through disability, infirmity, incompetence or misconduct. By the same token, the judiciary's power to govern itself would have little meaning if a judicial council were wholly powerless to take even such limited action as to attempt to persuade recalcitrant judges to adhere to its administrative strictures. We are satisfied, therefore, that a judicial council may exercise at least these limited remedial powers granted under the Act without unconstitutionally intruding upon a judge's independence.
 
 
 120
 The Act also expressly allows a judicial council, upon determining that a judge has engaged in conduct constituting one or more grounds for impeachment, to certify this determination to the Judicial Conference for eventual presentation to the House of Representatives. 28 U.S.C. Sec. 372(c)(7)(B). In subsection (3), infra, we uphold the constitutionality of this authority, and find that it does not "chill" a judge's independence any more than does existence of the impeachment power itself. Like the other sanctions we have discussed, this power, also, does not, in our view, impinge upon the protected independence of judges.
 
 
 121
 The one remaining express sanction we have yet to consider is that which allows a judicial council to forbid further assignment of cases to a judge on a temporary basis for a time certain. 28 U.S.C. Sec. 372(c)(6)(B)(iv). This raises much the same issue that the Chandler Court faced but did not decide. 398 U.S. 74, 90 S.Ct. 1648. Even more obviously than the sanction of reprimand by public announcement, 28 U.S.C. Sec. 372(c)(6)(B)(vi), this sanction presents a difficult constitutional issue.
 
 
 122
 Since, however, we have determined that a judicial council may constitutionally conduct an investigation, and that such an investigation may lead to any one of a number of legitimate outcomes, we need not adjudicate the difficult questions of the constitutional validity of the above two disciplinary sanctions. Unlike the milder remedies already approved--which we have had no difficulty upholding as facially constitutional even prior to their invocation--these two sanctions are not easily assessed outside a concrete factual setting. To determine their constitutionality while imposition is entirely speculative would be to proceed in a vacuum: we do not know how either sanction, if actually employed, might be tailored, and what its justification might be. A proper adjudication of the legitimacy of these two sanctions must await their actual imposition. See California Bankers Association v. Shultz, 416 U.S. 21, 56-57, 94 S.Ct. 1494, 1515-16, 39 L.Ed.2d 812 (1974); Zemel v. Rusk, 381 U.S. 1, 19-20, 85 S.Ct. 1271, 1282-83, 14 L.Ed.2d 179 (1965); Public Affairs Associates, Inc. v. Rickover, 369 U.S. 111, 113-14, 82 S.Ct. 580, 582-83, 7 L.Ed.2d 604 (1962).
 
 
 123
 We conclude that at least many of the authorized and likely results of an investigation under the Act do not intrude impermissibly upon judicial independence. Nor do we think that the burden of the investigation itself upon the judge under inquiry is so great that Congress could not constitutionally authorize an investigating committee and judicial council to conduct one. We think it extremely remote that the complaint procedure would or could be misdirected so as to affect in some way a judge's decision-making in particular cases. And except for the two sanctions whose constitutionality we have not addressed, the available sanctions are either too mild to threaten seriously a judge's decisional independence or, in the case of impeachment, see subsection (3), infra, remain essentially outside the judiciary's control. Accordingly, we uphold the constitutionality of the basic investigatory process insofar as it is claimed to impinge improperly upon a judge's independence.
 
 
 124
 (3) Appellants' claim that the authority given to the judicial branch to certify that grounds for impeachment may exist is inconsistent with the sole power of the House of Representatives to initiate impeachment proceedings.
 
 
 125
 Appellants contend that the Act is unconstitutional insofar as it empowers a judicial council, after completion of a committee's investigation, to certify that a judge's conduct may constitute grounds for impeachment.[20] Appellants argue that only the House of Representatives, pursuant to its sole power to initiate impeachment proceedings against an Article III judge, can investigate a judge with an eye towards impeachment. We reject this contention because the Constitution's impeachment provisions do not require that the House itself perform all preliminary investigatory functions that ultimately may inform its decision whether or not to impeach. Those provisions, therefore, do not detract from Congress's power to grant judicial councils authority to undertake an investigation of an Article III judge with, among other things, an eye to determining whether or not potential grounds for impeachment may exist which should be called to the attention of the House of Representatives.
 
 
 126
 Appellants point out that the House has the sole power to impeach. See note 14, supra. Consequently, appellants contend, any investigation directed at aiding the House in making its decision whether or not to initiate impeachment proceedings cannot proceed outside the legislative branch. However, we are aware of no authority--nor have appellants directed us to any--that would suggest that the House's sole power to impeach necessarily entails the sole power to investigate. It seems clear that, even apart from the Act, any person--including an individual judge, a judicial council, or the Judicial Conference--may call the House's attention to what he believes to be a potentially impeachable offense and forward to the House any relevant evidence that he has obtained. The House is free to act upon this information or ignore it, as it chooses. Nothing in the Act effects any change in the impeachment procedures or standards to be followed in the House. Accordingly, formally authorizing the judiciary to assume some initial fact-gathering responsibility with respect to complaints that may lead to impeachment does not intrude upon the House's sole power of decision whether or not to impeach.
 
 
 127
 We have already concluded in subsections (1) and (2) above that there is no constitutional flaw in Congress's grant to judicial councils of administrative powers to provide for the "effective and expeditious administration of the business of the courts," Chandler, 398 U.S. at 86 n. 7, 90 S.Ct. at 1654 n. 7; that these powers may properly encompass a power to look into allegations of judicial disability or misconduct and to take such remedial administrative measures as are properly available to a council; and that the mere existence and operation of such an investigatory mechanism does not intrude impermissibly upon the independence of each individual judge. This being so, we can see no reason why the same administrative powers that Congress may grant to judicial councils may not encompass the power to pass along to Congress, at the conclusion of an investigation, whatever information the judicial council has uncovered, once the council finds that a judge's conduct might constitute one or more grounds for impeachment.
 
 
 128
 We recognize that the prospect of ultimate impeachment is far more serious than the possibility of imposition of some of the relatively minor sanctions authorized by the Act, such as private censure. Arguably a judicial council's investigation threatens a more troublesome chill of judicial independence insofar as it is directed in part at determining whether to recommend consideration of impeachment. But whatever chilling effect may result from the threat of impeachment is a more or less inevitable concomitant of Congress's power to impeach. Where a complaint made against him involves matters of such seriousness, an accused judge--as was true even before the existence of the Act--will almost certainly be aware that impeachment is a possibility. The provision of an orderly, less hit-or-miss method of providing Congress with information about such a possible offense is not "unfair" to the judge. That only the House can impeach does not imply that the subject of possible impeachment can count on the absence of this further mechanism to inform Congress that a problem warranting its attention may have arisen. Any "chilling" impact on a judge's independence that could result from this impeachment aspect is no more than the necessary and unavoidable byproduct of the existence of the impeachment remedy.
 
 
 129
 We might feel otherwise if, as appellants contend, the Act purported to allow a judicial council or the Judicial Conference to issue some kind of preliminary ruling on impeachability. Such a ruling might substantially alter the political context in which impeachment recommendations are brought before the House from that intended by the Framers--making it more difficult for the House to decline to impeach in the face of an express recommendation. Under section 372(c)(8), however, the Judicial Conference transmits to the House only its determination "that consideration of impeachment may be warranted." It does not determine that impeachment in fact is warranted, a determination properly left to the House. We conclude, therefore, that the Act's provision for a certification as to possible impeachability does not interfere with the House's sole power to impeach.
 
 
 130
 There is a further aspect of the impeachment issue upon which, however, we do not rule. The Act does not merely purport to authorize the Judicial Conference to certify to the House of Representatives that it inquire into the impeachment of a judge. By using mandatory language, the Act arguably requires that the Judicial Conference do so. See 28 U.S.C. Sec. 372(c)(7)(B), (8). So construed, the Act might be said to violate separation of powers principles or to create related difficulties. But if so, the very danger of unconstitutionality could cause a court to read the Act's language as less mandatory, so as to avoid such a result. See NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 507, 99 S.Ct. 1313, 1322, 59 L.Ed.2d 533 (1979). In any event, appellants, as subpoenaed witnesses, have little direct personal stake in this separation of powers matter; and the present proceedings have not yet reached a stage, and may never do so, where impeachment could become a live issue. And finally, of course, as already held, the current investigation would be constitutional even if some of the statutory options granted to a judicial council could not ultimately be sustained.
 
 
 131
 We conclude that the Constitution's grant to the House of the sole power of impeachment does not impede Congress's authority to authorize the judiciary, through its collective administrative organs, to conduct an investigation of a complaint against a sitting Article III judge. Such an investigation is proper for the purpose of determining whether grounds for impeachment may exist, as well as for many other purposes.
 
 
 132
 (4) Appellants' claim that the Act's standards of judicial misconduct are unconstitutionally vague and overbroad.
 
 
 133
 Appellants argue that the Act's standards of judicial misconduct as set out in section 372(c)(1)[21] are vague and overbroad. Although, as we have said, appellants may have standing to challenge the constitutional validity of the very mechanism for dealing with judicial misconduct complaints established by the Act, we cannot conclude that appellants--mere subpoenaed witnesses--also have standing to press claims that the Act's standard of conduct failed to give Judge Hastings adequate advance notice of proscribed conduct. Judge Hastings himself must present these claims in the proper forum. See, e.g., Blair, 250 U.S. at 279-83, 39 S.Ct. at 470-71.
 
 
 134
 We add that the standard of conduct set forth in section 372(c)(1)--"conduct prejudicial to the effective and expeditious administration of the business of the courts"--certainly is clear enough to put Judge Hastings on notice that criminal misconduct, potentially impeachable offenses (such as the bribery charge against Judge Hastings), and violations of the Code of Judicial Conduct fall within its ambit. There can be no dispute, therefore, that the complaint against Judge Hastings alleges at least some conduct properly the subject of investigation under any reasonable construction of the statutory standard. We are not asked to direct appellants to respond to Committee inquiries that arguably relate only to protected conduct beyond the scope of proper investigation; rather, the record indicates that the Committee's examination of Simons and Miller was plainly relevant to core allegations of serious misconduct, i.e., bribery. If, arguendo, the complaint does allege some conduct not a proper subject of investigation under the statutory standard, this is a matter properly raised by Judge Hastings himself rather than by subpoenaed witnesses.
 
 
 135
 Insofar as appellants assert the somewhat different claim that the statutory standard on its face is so vague and overbroad as to chill Article III judges' unfettered exercise of their judicial responsibilities and their first amendment rights, then, again, that is a claim properly brought by Judge Hastings himself. Only Judge Hastings, not these witnesses, has had the statutory standard applied to his conduct and therefore has suffered the alleged concrete harm necessary to challenge an alleged "chilling effect" on first amendment rights. See United Presbyterian Church in the U.S.A. v. Reagan, 738 F.2d 1375, 1378-79 (D.C.Cir.1984) (party lacks standing to challenge a "chilling effect" on speech without some showing of concrete harm, past or imminently threatened).[22]
 
 
 136
 (5) Appellants' claim that the Act violates the due process rights of judges under investigation.
 
 
 137
 Appellants also implicitly renew Judge Hastings' contention in Hastings that the Act violates the due process rights of judges under investigation in that it purportedly denies the judge the right to confront the evidence against him and impermissibly combines investigatory/prosecutorial and adjudicatory functions in the judicial council.[23] The former contention relates to the manner in which the Committee conducts its hearings vis-a-vis the judge himself, rather than the validity of the Committee's subpoena power or of the Committee's proceedings. Consequently, we need not consider this claim, nor does our original jurisdiction extend to it. If Judge Hastings' procedural rights are being denied, that does not impair the enforceability of the Committee's subpoenas; Judge Hastings himself must seek relief in the appropriate forum. We add that the provisions of section 372(c)(11)(B) of the Act--providing that the judge under investigation shall be afforded the opportunity to appear before the Committee, present evidence, compel the attendance of witnesses and the production of documents, cross-examine witnesses, and present argument--appear to undercut appellants' substantive argument.
 
 
 138
 Appellants' other claim of infringement of Judge Hastings' due process rights--an impermissible combination of investigatory and adjudicatory functions, which would make the Committee itself illegitimate from its inception--fares no better. We need not consider appellants' concern that the same body both "prosecutes" the accused judge and imposes sanctions after an "adjudicatory" determination, since, as we have pointed out, we need not yet reach the validity of a judicial council's imposition of particular disciplinary sanctions under the Act. See subsection (2), supra. To the extent a judicial council under the Act engages merely in fact-gathering, administrative adjustments, moral suasion, and certifying the possible existence of grounds for impeachment, it does not "adjudicate" the accused judge's rights and liabilities. Appellants' due process contention can be raised most meaningfully if and when the judicial council decides to impose a disciplinary sanction against Judge Hastings.
 
 
 139
 (6) Other issues.
 
 
 140
 Appellants also raise several constitutional issues not present in the District of Columbia litigation. First they argue that we cannot enforce the Committee's subpoenas because 1) the Committee does not permit counsel to accompany witnesses in the hearing room during examination (although a witness may leave the hearing room during examination, upon request, to confer with counsel), and 2) the Committee directs each witness before it to comply with the confidentiality requirements of section 372(c)(14) by not disclosing questions asked and answers given during the witness' appearance before the Committee. These Committee policies, according to appellants, violate witnesses' rights under the fifth and first amendments, respectively.
 
 
 141
 Both of these claims relate to the manner in which the Committee conducts its hearings rather than the validity of the Committee's subpoena power or of the Committee's exercise of that power vis-a-vis appellants. Consequently, our original jurisdiction to enforce or quash subpoenas issued under the seal of this court does not extend to deciding either claim, and we decline to do so. A constitutional challenge to the Committee's hearing procedures and confidentiality policies would have to be brought, if it can be brought at all, 28 U.S.C. Sec. 372(c)(10), in the district court, in the traditional manner.[24] We add, with respect to the claimed right to counsel, that that issue has been uniformly resolved adversely to appellants' position in the contexts of grand jury proceedings and proceedings before certain state investigatory bodies. See United States v. Mandujano, 425 U.S. 564, 581, 96 S.Ct. 1768, 1778, 48 L.Ed.2d 212 (1976); Anonymous v. Baker, 360 U.S. 287, 79 S.Ct. 1157, 3 L.Ed.2d 1234 (1959); In re Groban, 352 U.S. 330, 77 S.Ct. 510, 1 L.Ed.2d 376 (1957); In re Lowry, 713 F.2d 616 (11th Cir.1983); United States v. Daniels, 461 F.2d 1076 (5th Cir.1972).
 
 
 142
 Finally, appellants contend that the Committee's proceedings are illegitimate, and its subpoenas invalid and unenforceable, because the Committee's members were selected in violation of the Appointments Clause of the Constitution, Art. II, Sec. 2, cl. 2. Since appellants challenge the legitimacy of the Committee itself, it is possible that they have standing to raise this claim despite Blair, 250 U.S. 273, 39 S.Ct. 468, and that we must determine it prior to subpoena enforcement. But cf. Buckley v. Valeo, 424 U.S. 1, 142, 96 S.Ct. 612, 693, 46 L.Ed.2d 659 (1976) (past acts of Federal Election Commission accorded de facto validity despite unconstitutional selection of Commission members by Congress); Scaduto, 763 F.2d at 1202 (subpoenas issued by President's Commission on Organized Crime enforceable even though Commission constituted in violation of separation of powers doctrine). If so, however, the claim has no substantive merit.
 
 
 143
 The purported basis of appellants' claim is that the members of the Committee were appointed by Chief Judge Godbold of the Eleventh Circuit, pursuant to section 372(c)(4)(A) of the Act, whereas the Appointments Clause permits Congress to assign power to appoint "inferior officers" only to the President, heads of executive departments, and "the Courts of Law," not to an individual judge nor to the presiding member of the judicial council. The members of the Committee, however, were not "appointed" by the chief judge within the meaning of the Appointments Clause. The Committee members are not new appointees, but rather sitting federal judges already appointed by the President. Their selection for service on the Committee does not gain them new positions in any meaningful sense; to the contrary, service on a committee of the judicial council, when called upon, is merely an outgrowth of their existing responsibilities. See Shoemaker v. United States, 147 U.S. 282, 301, 13 S.Ct. 361, 391, 37 L.Ed. 170 (1893) (a statutory expansion of the functions of an existing position does not create a new office requiring re-appointment, at least where the newly-added duties are "germane" to existing functions). See also 28 U.S.C. Secs. 291, 292 (the Chief Justice may designate and temporarily assign any circuit judge to act as a circuit judge in another circuit if necessary; chief judges of circuit courts may make similar designations and temporary assignments with respect to district judges and districts within their circuits); id. Secs. 293-96. Consequently, the Appointments Clause in no way governs a chief judge's selection of Committee members pursuant to the Act. Since that selection is an administrative task performed "for the effective and expeditious administration of the business of the courts," Chandler, 398 U.S. at 86 n. 7, 90 S.Ct. at 1654 n. 7--a task squarely within the domain of the judicial council--it was appropriate that Congress should assign that task to the chief judge, the presiding member of the judicial council, see 28 U.S.C. Sec. 332(a)(1)(A), rather than to the court as a whole or to the executive branch.
 
 
 144
 IV. TECHNICAL OBJECTIONS TO THE COMMITTEE'S EXERCISE OF THE SUBPOENA POWER
 
 
 145
 Appellants raise the following technical objections to the Committee's subpoenas: 1) the Committee's use of executive law enforcement officers (FBI agents) to serve the subpoenas violated the Act and constitutional principles; 2) the Committee cannot compel appellants to appear in Committee proceedings or subpoena enforcement proceedings outside, and more than one hundred miles from, the Southern District of Florida, where they reside and were served; and 3) Williams cannot be compelled to produce the appointment diaries, guest sign-in sheets, and telephone logs described in the subpoena duces tecum served upon her because those documents are in the possession and under the control of Judge Hastings alone. We find no merit in these contentions.
 
 A. Use of FBI Agents to Serve Subpoenas
 
 146
 The Act provides that judicial council subpoenas "shall be served in the manner provided in Rule 45(c) of the Federal Rules of Civil Procedure." 28 U.S.C. Sec. 332(d)(1). That Rule states, "A subpoena may be served by the marshal, by his deputy, or by any other person who is not a party and is not less than 18 years of age." Furthermore, 18 U.S.C. Sec. 3052 specifically empowers agents of the FBI to serve subpoenas. We can perceive no imaginable separation-of-powers obstacle to the Committee's service of its subpoenas in a manner wholly consistent with those provisions. Appellants have suggested that service should instead have been effected by a United States Marshal, but United States Marshals, no less than FBI representatives, are executive officers within the Department of Justice. 28 U.S.C. Secs. 561-76; 28 C.F.R. Sec. 0.1.[25]
 
 
 147
 Appellants also claim that service by FBI agents violated the confidentiality requirements of the Act, section 372(c)(14), in that it revealed to those agents the identity of persons subpoenaed by the Committee. Even assuming that the Committee's decision to use FBI agents to serve subpoenas is reviewable in this court despite section 372(c)(10) (which precludes judicial review of certain orders and determinations under the Act), such a narrowly limited breach of confidentiality is necessary if Committee subpoenas are to be served at all. This manner of service, therefore, offends no statutorily protected rights of appellants.
 
 
 148
 B. Compelling Subpoenaed Witnesses to Appear More Than 100 Miles Outside Their District
 
 
 149
 Although the Act does not expressly define the geographical bounds of the Committee's subpoena power under section 372(c)(9)(A) and section 332(d)(1), we hold that the Act confers power to issue subpoenas at least throughout the circuit. Section 372(c)(9)(A) grants judicial councils "full subpoena powers," and nothing in section 372 or section 332 imposes any geographical restriction. Since the Federal Rules of Civil Procedure do not govern the issuance and service of subpoenas by judicial councils under the Act, see discussion of Fed.R.Civ.P. 81(a)(3), supra, but rather apply only to the issuance of subpoenas by the district courts, Fed.R.Civ.P. 1, the one-hundred mile restriction of Fed.R.Civ.P. 45(e)(1) is inapplicable. It would be nonsensical to conclude, absent an express restriction, that the judicial council of a circuit cannot exercise circuit-wide subpoena power under the Act. This is especially true when, as we have held, the subpoenas are issued under the seal of the court of appeals and are enforced by that court. Indeed, many federal administrative agencies have statutory authority to serve subpoenas nationwide. See, e.g., 15 U.S.C. Sec. 49 (Federal Trade Commission); 15 U.S.C. Secs. 78u(b), 79r(c) (Securities and Exchange Commission); 29 U.S.C. Sec. 161 (National Labor Relations Board). Since Williams, Ehrlich, Simons, and Miller all reside within the Eleventh Circuit, the Committee plainly did not exceed the geographical scope of its subpoena power when it subpoenaed them. We need not decide whether such a subpoena may be served beyond the circuit.
 
 
 150
 Given the Committee's circuit-wide subpoena power, there can be no obstacle to conducting subpoena enforcement proceedings at a location within the circuit that happens to be outside and more than one hundred miles from the Southern District of Florida. By way of analogy, this amount of travel and attendant expense is often required to prosecute or defend an appeal, or to bring a petition for review of federal administrative agency action, in the court of appeals. Indeed, certain statutes even require that any challenge to particular federal administrative actions be brought only in courts sitting in the District of Columbia. See 2 U.S.C. Sec. 437g(a)(8)(A); 47 U.S.C. Sec. 402(b).
 
 
 151
 C. Whether Williams, Secretary to Judge Hastings, May Be Compelled to Produce Appointment Diaries, Guest Sign-in Sheets, and Telephone Logs
 
 
 152
 The subpoena duces tecum served on Williams was not misdirected because seeking documents generated in Judge Hastings' chambers. We assume that Judge Hastings, as between the two, had paramount power over the disposition of the documents within his chambers. Nonetheless, a subpoena duces tecum can be enforced against a person in possession of records belonging to another. See Burdeau v. McDowell, 256 U.S. 465, 476, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921); Mattie T. v. Johnston, 74 F.R.D. 498, 502 (N.D.Miss.1976); United States v. National Broadcasting Co., 65 F.R.D. 415, 420 (C.D.Cal.1974), appeal dismissed, 421 U.S. 940, 95 S.Ct. 1668, 44 L.Ed.2d 97 (1975); United States v. Re, 313 F.Supp. 442, 449 (S.D.N.Y.1970). Williams had immediate physical possession and custody of these documents at her place of work, had full access to them, and indeed even created and maintained some or all of them, in the performance of her duties. She has responded to two previous virtually identical subpoenas--the first served on her on October 12, 1981 in connection with the Hastings grand jury proceedings and the second served on her on April 11, 1985 in connection with the Committee's investigation--by producing similar categories of documents, including many of the same documents (to the grand jury) and copies of most if not all of the same documents (to the FBI). Accordingly, we have no qualms about Williams' custody of the documents and her ability to produce them in compliance with the subpoena duces tecum. Judge Hastings' interest in the disposition of the subpoenaed documents is amply protected in that he is a party to the appeal before us (in which he seeks equitable replevin of the documents turned over by Williams in response to the Committee's April 11, 1985 subpoena), and, as a practical matter, has had a full opportunity in this court to show why the subpoena duces tecum against Williams should not be enforced.[26]
 
 
 153
 V. APPELLANTS' CLAIM OF A PRIVILEGE PROTECTING COMMUNICATIONS AMONG JUDGE HASTINGS AND MEMBERS OF HIS STAFF
 
 
 154
 Appellants urge this court to decline to enforce the subpoenas directed to Williams, Ehrlich, Simons, and Miller because they have invoked a testimonial privilege--claimed by Judge Hastings and honored by his staff--that purportedly protects against disclosure of confidential communications among an Article III judge and members of his staff regarding the performance of his judicial duties. Appellants liken this privilege to the executive privilege surrounding Presidential communications, the protection expressly accorded Congressional activities by the Speech or Debate Clause of the Constitution, Art. I, Sec. 6, clause 1, and common-law privileges such as that protecting the confidentiality of communications between attorney and client. Enforcement of these subpoenas, it is urged, would require that Williams, Ehrlich, Simons, and Miller reveal confidences entrusted to them by Judge Hastings and would thereby threaten the independence and the effective functioning of the judiciary by chilling and obstructing the full and frank exchange of ideas within chambers necessary to a judge's performance of his official duties.
 
 
 155
 But with regard to Williams and Ehrlich, the claim of testimonial privilege is not yet ripe for decision. Williams was subpoenaed to testify on May 20, 1985, Ehrlich on May 27, 1985. Both witnesses failed to appear, asserting privilege. It is well settled that a witness whose testimony is subpoenaed cannot simply refuse to appear altogether on grounds of privilege, but rather must appear, testify, and invoke the privilege in response to particular questions. In re Grand Jury Subpoenas Duces Tecum, 695 F.2d 363, 366 (9th Cir.1982); In re Walsh, 623 F.2d 489, 493 (7th Cir.), cert. denied, 449 U.S. 994, 101 S.Ct. 531, 66 L.Ed.2d 291 (1980); In re Possible Violations of 18 U.S.C. Secs. 371, 641, 1503, 564 F.2d 567, 571 (D.C.Cir.1977). See also Branzburg v. Hayes, 408 U.S. 665, 709, 92 S.Ct. 2646, 2670, 33 L.Ed.2d 626 (1972); In re Grand Jury Proceedings, 694 F.2d 1256, 1258 (11th Cir.1982); United States v. Hankins, 565 F.2d 1344, 1349-50 (5th Cir.1978), cert. denied, 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979); United States v. Roundtree, 420 F.2d 845, 852 (5th Cir.1969). Otherwise, a court would be forced to attempt to determine the existence, application, and scope of an asserted privilege in ignorance of the context in which it is alleged to apply. No possible testimonial privilege here would be of such a kind as could excuse Williams and Ehrlich from the fundamental obligation of appearing before the Committee for testimony, and then invoking the privilege before the Committee. Thus, we will not adjudicate Williams' and Ehrlich's claims of testimonial privilege as they are currently framed.
 
 
 156
 Besides commanding Williams to testify, her subpoena commanded her to produce certain documents. We will consider Williams' claim of privilege in respect to these. We will also consider Simons' and Miller's claims of testimonial privilege because both have appeared before the Committee and invoked a privilege in response to specific questions.[27]
 
 
 157
 Although we have found no case in which a judicial privilege protecting the confidentiality of judicial communications has been applied, the probable existence of such a privilege has often been noted. In Nixon v. Sirica, 487 F.2d 700, 717 (D.C.Cir.1973), the District of Columbia Circuit analogized President Nixon's executive privilege, "intended to protect the effectiveness of the executive decision-making process," to that "among judges, and between judges and their law clerks." The same court subsequently reiterated this analogy in Senate Select Committee on Presidential Campaign Activities v. Nixon, 498 F.2d 725, 729 (D.C.Cir.1974). Judge MacKinnon's dissent in Nixon v. Sirica traced such authorities as existed to support the recognition of a judicial privilege, noting, "Express authorities sustaining this position are minimal, undoubtedly because its existence and validity has been so universally recognized. Its source is rooted in history and gains added force from the constitutional separation of powers of the three departments of government." Id. at 740 (MacKinnon, J., dissenting). In a concurring opinion in Soucie v. David, 448 F.2d 1067, 1080 (D.C.Cir.1971), Judge Wilkey, discussing Freedom of Information Act exemptions from disclosure of certain executive branch information, stated, "[I]t must be understood that the privilege against disclosure of the decision-making process is a tripartite privilege, because precisely the same privilege in conducting certain aspects of public business exists for the legislative and judicial branches as well as for the executive. It arises from two sources, one common law and the other constitutional." See also Statement of the Judges, 14 F.R.D. 335 (N.D.Cal.1953); Comment, The Law Clerk's Duty of Confidentiality, 129 U.Pa.L.Rev. 1230 (1981).
 
 
 158
 Express Supreme Court acknowledgment of such a privilege is sparse; however, Chief Justice Burger has noted the Court's inherent power to protect the confidentiality of its internal operations:
 
 
 159
 With respect to the question of inherent power of the Executive to classify papers, records, and documents as secret, or otherwise unavailable for public exposure, and to secure aid of the courts for enforcement, there may be an analogy with respect to this Court. No statute gives this Court express power to establish and enforce the utmost security measures for the secrecy of our deliberations and records. Yet I have little doubt as to the inherent power of the Court to protect the confidentiality of its internal operations by whatever judicial measures may be required.
 
 
 160
 New York Times v. United States, 403 U.S. 713, 752 n. 3, 91 S.Ct. 2140, 2160 n. 3, 29 L.Ed.2d 822 (1971) (Burger, C.J., dissenting).
 
 
 161
 The Supreme Court's reasons for finding a qualified privilege protecting confidential Presidential communications in United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), support the existence of a similar judicial privilege. The Court based the executive privilege on the importance of confidentiality to the effective discharge of a President's powers, stating,
 
 
 162
 [T]he importance of this confidentiality is too plain to require further discussion. Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process.
 
 
 163
 Id. at 705, 94 S.Ct. at 3106. The Court discerned the constitutional foundation for the executive privilege--notwithstanding the lack of any express provision--in the constitutional scheme of separation of powers and in the very nature of a President's duties:
 
 
 164
 [T]he privilege can be said to derive from the supremacy of each branch within its own assigned area of constitutional duties. Certain powers and privileges flow from the nature of enumerated powers; the protection of the confidentiality of Presidential communications has similar constitutional underpinnings.
 
 
 165
 Id. at 705-06, 94 S.Ct. at 3106-07.
 
 
 166
 If so, the same must be true of the judiciary. The Court, indeed, likened "[t]he expectation of a President to the confidentiality of his conversations and correspondence" to "the claim of confidentiality of judicial deliberations." United States v. Nixon, 418 U.S. at 708, 94 S.Ct. at 3107. Judges, like Presidents, depend upon open and candid discourse with their colleagues and staff to promote the effective discharge of their duties. The judiciary, no less than the executive, is supreme within its own area of constitutionally assigned duties. Confidentiality helps protect judges' independent reasoning from improper outside influences. It also safeguards legitimate privacy interests of both judges and litigants.
 
 
 167
 We conclude, therefore, that there exists a privilege (albeit a qualified one, infra) protecting confidential communications among judges and their staffs in the performance of their judicial duties. But we do not think that this qualified privilege suffices to justify either Williams' noncompliance with the Committee's subpoena duces tecum, or Simon's and Miller's refusals to answer the questions directed to them by the Committee.
 
 
 168
 A party raising a claim of judicial privilege has the burden of demonstrating that the matters under inquiry fall within the confines of the privilege. The judicial privilege is grounded in the need for confidentiality in the effective discharge of the federal judge's duties. In the main, the privilege can extend only to communications among judges and others relating to official judicial business such as, for example, the framing and researching of opinions, orders, and rulings. Accordingly, Williams had the burden of showing that the Committee's subpoena duces tecum called for the production of documents that would reveal communications concerning official judicial business. We conclude that she has failed to meet that burden.
 
 
 169
 The Committee's subpoena duces tecum served upon Williams directs her to produce only the following documents:
 
 
 170
 1. Appointment diaries, daily schedules or itineraries, calendars, travel itineraries;
 
 
 171
 2. Guest and/or client sign-in sheets;
 
 
 172
 3. Telephone message books, logs and memoranda....
 
 
 173
 From this description alone, we cannot determine that the above documents would come within a judicial privilege. Most such documents would not ordinarily be expected to reveal the substance of communications among Judge Hastings, his colleagues, and his staff concerning Judge Hastings' official duties. That Judge Hastings met or spoke with a particular visitor at a particular time, without more, would not involve the substance of the communications between them.[28] Cf. In re Grand Jury Proceedings, 689 F.2d 1351, 1352 (11th Cir.1982) (attorney-client privilege ordinarily applies only to content of communications, not to dates, places, or times of meetings).
 
 
 174
 Moreover, even if the subpoenaed materials were to include some substantive matters that fell within the privilege, we conclude, for reasons stated subsequently in our discussion relating to Simons and Miller, that the privilege would not support Williams' refusal to comply. The seriousness of the Committee's investigation, and the apparent relevance of the subpoenaed documents to that investigation, would justify enforcement of the subpoena in these circumstances regardless of the assertion of privilege, the privilege being qualified, not absolute. See infra. We accordingly reject Williams' assertion of privilege to justify non-compliance with the Committee's subpoena duces tecum.[29]
 
 
 175
 Turning next to the testimony of Simons and Miller before the Committee, our review of the transcripts leaves little doubt that the boundaries of the judicial privilege do encompass the subject matter of the Committee's inquiries to them. They invoked the privilege in response to questions probing the core of the confidentiality interest at stake: communications among Judge Hastings and his staff concerning matters pending before Judge Hastings. That the privilege applies, however, does not end the matter. The judicial privilege is only qualified, not absolute; it can be overcome in an appropriate case.
 
 
 176
 The Supreme Court in United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, has made clear that the executive privilege is a qualified one:
 
 
 177
 However, neither the doctrine of separation of powers, nor the need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances. The President's need for complete candor and objectivity from advisers calls for great deference from the courts. However, when the privilege depends solely on the broad, undifferentiated claim of public interest in the confidentiality of such conversations, a confrontation with other values arises. Absent a claim of need to protect military, diplomatic, or sensitive national security secrets, we find it difficult to accept the argument that even the very important interest in confidentiality of Presidential communications is significantly diminished by production of such material for in camera inspection with all the protection that a district court will be obliged to provide.
 
 
 178
 The impediment that an absolute, unqualified privilege would place in the way of the primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions would plainly conflict with the function of the courts under Art. III. In designing the structure of our Government and dividing and allocating the sovereign power among three co-equal branches, the Framers of the Constitution sought to provide a comprehensive system, but the separate powers were not intended to operate with absolute independence.
 
 
 179
 While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. , at 635 [72 S.Ct. 863, at 870, 96 L.Ed. 1153 (1952) ] (Jackson, J., concurring).
 
 
 180
 To read the Art. II powers of the President as providing an absolute privilege as against a subpoena essential to enforcement of criminal statutes on no more than a generalized claim of the public interest in confidentiality of nonmilitary and nondiplomatic discussions would upset the constitutional balance of "a workable government" and gravely impair the role of the courts under Art. III.
 
 
 181
 Id. at 706-07, 94 S.Ct. at 3106-07. The judicial privilege, arising from similar constitutional underpinnings, shares similar limitations and restrictions.[30] Like any testimonial privilege, the judicial privilege must be harmonized with the principle that " 'the public ... has a right to every man's evidence.' " United States v. Bryan, 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950). This principle is no less applicable to proceedings under the Act than to criminal proceedings.
 
 
 182
 Once the party asserting the privilege has met the burden of showing that the matters under inquiry implicate communications among a judge and his staff concerning performance of judicial business--as Simons and Miller have shown here--those matters are presumptively privileged and need not be disclosed unless the investigating party can demonstrate that its need for the materials is sufficiently great to overcome the privilege. To meet this burden, the investigating party can attempt to show the importance of the inquiry for which the privileged information is sought; the relevance of that information to its inquiry; and the difficulty of obtaining the desired information through alternative means. The court then must weigh the investigating party's demonstrated need for the information against the degree of intrusion upon the confidentiality of privileged communications necessary to satisfy that need. We hold that the judicial privilege asserted by Simons and Miller on Judge Hastings' behalf is overridden, under the circumstances present here, by the Committee's need for Simons' and Miller's testimony to further its investigation.
 
 
 183
 There can be no question that the Committee's investigation is a matter of surpassing importance. While criminal remedies may no longer be in issue, a proceeding which could result in recommending the exoneration of a sitting Article III judge, or in certifying to the House of Representatives that consideration of impeachment may be warranted, obviously implicates concerns of fairness and thoroughness of a high order. And the charges being investigated--particularly the allegation of bribery--are grave.[31] As we said in our previous opinion arising out of the Hastings investigation,
 
 
 184
 Moreover, the question under investigation--whether an Article III judge should be recommended for impeachment by the Congress, otherwise disciplined, or granted a clean bill of health--is a matter of great societal importance. Given the character of an investigating committee and what is at stake--the public confidence in the judiciary, the independence and reputation of the accused judge--paragraph (c)(5) must in our view be read, with very few strings, as conferring authority to look into whatever is material to a determination of the truth or falsity of the charges.
 
 
 185
 In re Petition to Inspect and Copy Grand Jury Materials, 735 F.2d at 1269-70.
 
 
 186
 The Committee's inquiries of Simons and Miller, like the grand jury records the Committee sought and obtained in its previous suit, appear closely pertinent to the Committee's effective discharge of its responsibilities under the Act. These inquiries relate to the role played by Simons and Miller in the preparation of an order entered by Judge Hastings on October 6, 1981 in United States v. Romano, 523 F.Supp. 1209, an order that was alleged to be the result of bribery. The Committee could hardly undertake a full and complete investigation of a complaint growing out of charges that a judge's ruling was influenced by bribery without questioning the judge's staff about the in-chambers communications that led to the particular ruling. We can think of no adequate substitute for this line of questioning, assuming the Committee's investigation is to be meaningful. The Committee's particular questions to Simons and Miller adhere to this legitimate investigatory goal.
 
 
 187
 We recognize that the Committee already possesses records of the Hastings grand jury proceedings, apparently including transcripts of the grand jury's examination of Simons and Miller, and that the Committee may also possess transcripts of the Hastings and Borders criminal trials, apparently including examination of Miller. But possession of these does not defeat the Committee's authority to compel Simons and Miller to testify before it. As to matters not addressed in their prior testimony, ipso facto there exists no previous testimony to diminish the Committee's need to hear these witnesses' testimony now; as to matters that were previously testified to, the force of any asserted privilege is mitigated somewhat--even absent any formal waiver by Judge Hastings[32]--by the fact that these witnesses already have testified previously and thereby breached confidentiality to some degree. See Nixon v. Sirica, 487 F.2d 700, 718 (D.C.Cir.1973) (confidentiality of taped Presidential conversations "substantially diminishe[d]" by public testimony concerning the substance of those conversations).
 
 
 188
 More important, regardless of how much prior testimony of Simons and Miller the Committee may possess or acquire in transcript form, the Committee is entitled to believe that live testimony is crucial to the goal of a thorough investigation. Only through the medium of such testimony can the Committee hear and judge for itself the demeanor and credibility of relevant witnesses, rather than be relegated to reliance on a cold transcript. Given the importance of the investigation, this goal of thoroughness is a weighty one. As we noted in our previous opinion in this matter,
 
 
 189
 The Committee is charged under the Act with conducting an investigation in order to further "the effective and expeditious administration of the business of the courts...." 28 U.S.C. Sec. 372(c)(6)(B). As already noted, the Committee's investigation is to be "as extensive as it considers necessary." Section 372(c)(5). A thorough investigation is essential not only to ensure the integrity of federal judges, but also to instill public confidence in the judiciary.... The Committee must be able to represent to the Council, and the Council must be satisfied, that all available evidence of possible materiality has been sifted: for the Committee to examine matters extensively and find nothing may be as much a part of its duty as to look at evidence whose incriminating nature is known in advance. The object of the investigation is not to prove a case against the judge but to determine whether there is or is not a case.
 
 
 190
 In re Petition to Inspect and Copy Grand Jury Materials, 735 F.2d at 1273. See also Nixon v. Sirica, 487 F.2d at 717 (President must turn over, in compliance with grand jury subpoena, relevant portions of taped Presidential conversations; court stresses importance of thorough grand jury investigation to fulfill grand jury's function "not only to indict persons when there is probable cause to believe they have committed crime, but also to protect persons from prosecution when probable cause does not exist"). Allowing witnesses to withhold evidence relevant to the Committee's investigation could call into question the Committee's ability to arrive at an accurate recommendation and thus could gravely impair the Committee's performance of its statutorily-assigned functions. Under all the circumstances, therefore, we place a heavy weight on the Committee's need for the testimony of Simons and Miller concerning the subject matter as to which they asserted a privilege.
 
 
 191
 Under the principles enunciated in United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, the Committee's need for the testimony of Simons and Miller must be weighed against Judge Hastings' interest in the confidentiality of the in-chambers communications that may be revealed. In Nixon the Court held that the need for relevant evidence in criminal proceedings overrode "the President's assertion of a generalized privilege of confidentiality." Id. at 712 n. 19, 94 S.Ct. at 3109 n. 19. The Court placed substantial emphasis on the general nature of the asserted interest, carefully distinguishing it from a specific "claim of need to protect military, diplomatic, or sensitive national security secrets." Id. at 706, 94 S.Ct. at 3106; see id. at 710, 712 n. 19, 94 S.Ct. at 3108, 3109 n. 19. The Court accordingly held,
 
 
 192
 A President's acknowledged need for confidentiality in the communications of his office is general in nature, whereas the constitutional need for production of relevant evidence in a criminal proceeding is specific and central to the fair adjudication of a particular criminal case in the administration of justice. Without access to specific facts a criminal prosecution may be totally frustrated. The President's broad interest in confidentiality of communications will not be vitiated by disclosure of a limited number of conversations preliminarily shown to have some bearing on the pending criminal cases.
 
 
 193
 We conclude that when the ground for asserting privilege as to subpoenaed materials sought for use in a criminal trial is based only on the generalized interest in confidentiality, it cannot prevail over the fundamental demands of due process of law in the fair administration of criminal justice. The generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial.
 
 
 194
 Id. at 712-13, 94 S.Ct. at 3109-10.
 
 
 195
 In the instant case, as well, Judge Hastings' assertion of a confidentiality interest is generalized in nature. Judge Hastings has not directed the attention of this court to any further, specific need for secrecy over and above those needs which normally apply and give rise, in the first place, to a privilege. On the other side of the balance, again, the Committee's particular need for these witnesses' testimony implicates concerns of great moment.
 
 
 196
 The procedures surrounding an investigation under the Act, too, present circumstances which mitigate the force of Judge Hastings' confidentiality interest in avoiding testimony about assertedly privileged communications. In Nixon, the Court--as a means of protecting confidentiality to the maximum possible extent--ordered in camera examination by the district court of the subpoenaed tape recordings and documents. Id. at 706, 714-16, 94 S.Ct. at 3106, 3110-11. The principle, of course, is that disclosure of privileged information to a federal judge constitutes an extremely limited breach of confidentiality, see Nixon v. Sirica, 487 F.2d at 719-20, since federal judges can be expected as an obligation of their office to respect the confidentiality of sensitive or privileged information. See also Kerr v. United States District Court, 426 U.S. 394, 405-06, 96 S.Ct. 2119, 2125-26, 48 L.Ed.2d 725 (1976); In re Grand Jury Proceedings in Matter of Freeman, 708 F.2d 1571, 1576 (11th Cir.1983). In the instant case, the Committee itself consists of federal judges, so disclosure of the substance of the privileged communications here threatens Judge Hastings' confidentiality interest little more than would in camera examination. See In re Petition to Inspect and Copy Grand Jury Materials, 735 F.2d at 1274. Federal judges will be uniquely cognizant of the need to safeguard the confidentiality of in-chambers communications among an Article III judge and his staff.[33] In addition, any privileged testimony or documents received by the Committee will remain confidential under the provisions of section 372(c)(14) of the Act.[34] Therefore, having weighed the competing concerns in the balance, we hold that the Committee's need for these witnesses' testimony outweighs Judge Hastings' asserted interest in non-disclosure.
 
 
 197
 We add that while the Committee's questions to Simons and Miller were manifestly relevant here, we would enforce the subpoenas upon a lesser showing of relevance so long as a reasonable degree of materiality could be discerned. Where, as here, a judicial council investigation concerns allegations of unquestionable seriousness, we believe that, given the make-up of judicial councils and the secrecy surrounding their investigations under the Act, any subpoena for material protected only by an asserted generalized need for confidentiality should be enforceable so long as the information sought does not on its face seem irrelevant to the investigation. The issuance of such a subpoena means that Article III judges already have satisfied themselves of the relevance of, and need for, the information sought and the existence of probable cause for the investigation itself. See also In re Grand Jury Proceedings in Matter of Freeman, 708 F.2d 1571, 1575 (11th Cir.1983) (grand jury subpoena is enforceable without a specific showing of relevance and need, despite witness' claim that enforcement of the subpoena could impair the right enjoyed by the target of the investigation to counsel of his choice); In re Slaughter, 694 F.2d 1258, 1260 (11th Cir.1982); In re Grand Jury Proceedings, 694 F.2d 1256, 1258 (11th Cir.1982). We need not determine here whether more (or less) scope might be given to the assertion of a claim of judicial privilege in other contexts, such as where the investigation is aimed at conduct less serious than the potentially impeachable offense of bribery; where a privilege is asserted to protect specific sensitive items rather than to promote a generalized need for confidentiality; or where a privilege is invoked in a proceeding other than an investigation under the Act.
 
 
 198
 For the reasons stated, the court finds 1) that it has exclusive original jurisdiction to determine motions to enforce or quash subpoenas issued under its seal pursuant to the Act; 2) that appellants' constitutional and technical objections to the Committee's issuance and service of subpoenas either are beyond this court's jurisdiction, may not properly be decided in the present proceedings, or lack merit; and 3) that the Committee's subpoenas directed to appellants are enforceable despite appellants' invocation of a privilege protecting communications among Judge Hastings and his staff. Accordingly, the judgment of the district court is AFFIRMED. The motions to quash filed by Williams, Ehrlich, and Simons are DENIED. Williams and Ehrlich are ordered to comply with the Committee's subpoenas at a time and place to be prescribed by the Committee. Simons and Miller are ordered to testify fully as to all pertinent matters at a time and place to be prescribed by the Committee.
 
 
 199
 So ordered.
 
 PELL, Senior Circuit Judge, concurring:
 
 200
 Inasmuch as the final opinion of the panel will not be filed prior to January 1, 1986, and inasmuch as I will not be engaging in any judicial activity for an indeterminate period subsequent to December 31, 1985, I am filing this separate concurrence as of December 30, 1985.
 
 
 201
 I base this concurrence on having read the briefs of the parties, having heard oral argument, and having examined a preliminary draft of the proposed opinion. I authorize Chief Judge Campbell and Judge Kearse to issue this concurrence at the time they issue their opinion for the panel.
 
 
 202
 Specifically, I concur as of this date in the opinion of the panel insofar as it results in findings that this court has exclusive original jurisdiction to determine motions to enforce or quash subpoenas issued under its seal pursuant to the Act; that appellants' constitutional and technical objections to the Committee's issuance and service of subpoenas either are beyond this court's jurisdiction, may not properly be decided in the present proceedings, or lack merit, and that the Committee's subpoenas directed to appellants are enforceable despite appellants' invocation of a privilege protecting communications among Judge Hastings and his staff.
 
 
 203
 I therefore would hold that the judgment of the district court should be affirmed.
 
 
 204
 I would further hold that the motions to quash by Williams, Ehrlich, and Simons should be denied, and would order Williams and Ehrlich to comply with the Committee's subpoenas at a time and place to be prescribed by the Committee. I would further order Simons and Miller to testify fully as to all pertinent matters at a time and place to be prescribed by the Committee.
 
 
 205
 I hereby join in any judgment to the above effect and expressly authorize the clerk to so indicate.
 
 
 
 *
 Honorable Levin H. Campbell, Chief Judge for the U.S. Court of Appeals for the First Circuit, sitting by designation
 
 
 **
 Honorable Amalya Lyle Kearse, U.S. Circuit Judge for the Second Circuit, sitting by designation
 
 
 ***
 Honorable Wilbur F. Pell, Jr., Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 [1]
 This panel was specially designated to sit on these matters upon recusal of all the active judges of the United States Court of Appeals for the Eleventh Circuit. Completion of this opinion was delayed by the need to obtain further briefing in September 1985 as a consequence of the District of Columbia Circuit's opinion issued on August 13, 1985 in Hastings v. Judicial Conference of the United States, 770 F.2d 1093 (D.C.Cir.1985), vacating the district court's opinion in that case. See Section III, infra
 
 
 [2]
 For convenience we will henceforth use the term "appellants" to refer to Judge Hastings and the present and former members of his staff involved herein. We will do so in connection with the original subpoena enforcement action as well as the appeal
 
 
 [3]
 The subpoena duces tecum to Williams commanded her
 to bring with you for the time period March 1, 1981, to April 1, 1983, the originals of all of the documents listed below, which are in your possession, custody, care and/or control of the United States District Court for the Southern District of Florida and are the official records of the Honorable Alcee L. Hastings, Judge, United States District Court for the Southern District of Florida:
 
 
 [1]
 Appointment diaries, daily schedules or itineraries, calendars, travel itineraries;
 
 
 [2]
 Guest and/or client sign-in sheets;
 
 
 [3]
 Telephone message books, logs and memoranda
 
 
 [4]
 Previously, on or about April 11, 1985, the Committee had served a subpoena duces tecum on Williams directing her--in terms identical to the subsequent May subpoena--to produce the originals of appointment diaries, telephone logs, and the like from Judge Hastings' chambers. Williams responded to the subpoena by providing an FBI representative with copies of documents described in the subpoena. On or about April 15, 1985, Judge Hastings served notice of his objection to these actions upon the Committee and demanded return of the documents. They have not been returned, but have been maintained in the FBI's Miami office pending a judicial determination
 
 
 [5]
 It is true, as appellants urge, that subpoenas issued under the seal of the district court pursuant to the Federal Rules of Civil Procedure compel the attendance of witnesses or the production of documents in proceedings before the district court itself, not in proceedings before an investigatory body like the Committee. However, in the present circumstances we see no inhibition upon Congress's power to authorize courts' issuance of subpoenas in connection with proceedings that are not, strictly speaking, those of the issuing court. It is well settled that subpoenas issued under district court seal pursuant to Fed.R.Crim.P. 17 may be served to compel attendance or production in grand jury proceedings. 8 Moore's Federal Practice p 17.02, at 17-6 (1984). The fact that judicial investigating committees are made up of a majority of court of appeals judges, and are engaged in a proceeding intimately tied into the official functions of the courts, makes it particularly understandable that Congress would authorize the issuance of subpoenas constituting process of the court of appeals
 
 
 [6]
 Appellants raise an imaginative argument that Marbury v. Madison, 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803), casts doubt on our interpretation of section 332(d)(1). The Act confers the power to issue subpoenas on the Judicial Conference of the United States, or a standing committee thereof, as well as on judicial councils, and in doing so uses language parallel to the provisions of section 332(d)(1): "Subpoenas and subpoenas duces tecum [of the Judicial Conference] shall be issued by the clerk of the Supreme Court or by the clerk of any court of appeals, at the direction of the Chief Justice or his designee and under the seal of the court...." 28 U.S.C. Sec. 331. Under the Committee's reasoning, appellants contend, this language would confer on the Supreme Court original jurisdiction to enforce Judicial Conference subpoenas issued under its seal. Marbury, however, holds that Congress lacks the power to expand the original jurisdiction of the Supreme Court beyond that specifically described in the Constitution
 The issue of the Supreme Court's jurisdiction to hear motions to enforce or quash subpoenas in an appropriate case is not before us, so we need not decide whether the exercise of such jurisdiction would contravene the principles enunciated in Marbury. Given the ample basis for our finding that section 332(d)(1) confers original jurisdiction on courts of appeals in this limited area, we are not moved to question our finding merely because it raises the possibility of constitutional defects in a companion provision. We note that appellants' warning, even if correct, would not wholly scuttle the subpoena provisions of section 331, since that section authorizes issuance of subpoenas by the clerk and under the seal of the Supreme Court or "any court of appeals." (Emphasis added.)
 
 
 [7]
 In contrast to the Chief Judge's role, the clerk of the court of appeals fills the same role in issuing the subpoena as does the district court clerk when he issues a subpoena in blank to a civil litigant. Section 332(d)(1) provides that the subpoena is to be issued "by the clerk," the identical phraseology used in Fed.R.Civ.P. 45 and Fed.R.Crim.P. 17 (emphasis added). In affixing the seal of the court he clearly acts as an officer of the court of appeals, not, as appellants would have it, an officer in the "administrative" proceedings of the judicial council
 
 
 [8]
 On the assumption that appellants' Count II below, Judge Hastings' claim for equitable replevin to recover subpoenaed documents given by Williams to the FBI, was within the district court's jurisdiction rather than within our exclusive original jurisdiction to enforce or quash the Committee's subpoenas, we will reach the merits of that claim and affirm the district court's dismissal of Count II on the merits. Note 29, infra
 
 
 [9]
 In the alternative, even were our finding of original jurisdiction incorrect, we would nevertheless have appellate jurisdiction to review the district court's alternative ruling that appellants' challenges to the subpoenas lacked merit. The district court provided this alternative ruling on the merits despite its conclusion that it lacked subject-matter jurisdiction
 
 
 [10]
 We hold in Section V, infra, that communications between a judge and his personal staff are subject to a qualified privilege. In weighing whether the privilege prevents enforcement of these subpoenas, a seemingly inescapable factor is the constitutionality of the existence and functions of the Committee. If the Committee were unconstitutional, it would be hard to say that its interest in receiving appellants' evidence outweighs the judge's interest in confidentiality
 
 
 [11]
 See Section V, infra
 
 
 [12]
 The "following actions" listed in the Act are: certifying to the (mental or physical) disability of the judge, pursuant to standards and procedures set out in 28 U.S.C. Sec. 372(b); requesting the judge to retire voluntarily; ordering that for a temporary period no further cases be assigned to the judge; censuring the judge privately or by public announcement; or referring the complaint, record and proceedings of a potentially impeachable offense to the Judicial Conference of the United States for possible transmission to the House of Representatives. 28 U.S.C. Sec. 372(c)(6) and (7). A judicial council is specifically prohibited from ordering "removal from office of any judge appointed to hold office during good behavior." 28 U.S.C. Sec. 372(c)(6)(B)(vii)
 
 
 [13]
 Placing a permanent complaints commission outside the judicial branch might invite continual warfare between the commission and the federal judiciary. Such a commission outside the judiciary might inhibit the independence of courts were the commission to threaten to trim judicial budgets and take political action against the judiciary unless courts conformed their decisions and the conduct of the judges to its wishes. It was to avoid such problems that Congress chose, at the urging of the Judicial Conference of the United States, to vest the powers in question within the judiciary itself. The Judicial Conference concluded that placing this disciplinary machinery within the judicial branch is "least disruptive of our constitutional concept of an independent judiciary." Judicial Tenure and Discipline--1979-80: Hearings before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice, 96th Cong., 1st and 2d Sess. 68 (1980) (statement of Judge Elmo B. Hunter, Chairman, Committee on Court Administration of the Judicial Conference of the United States)
 
 
 [14]
 Article III provides that judges "shall hold their Offices during good Behaviour." Art. III, Sec. 1. Section 4 of Article II states, "The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors."
 The Constitution places the decision whether or not to impeach within the sole province of the House of Representatives, Art. I, Sec. 2, and grants the Senate the sole power to try all impeachments. Art. I, Sec. 3.
 
 
 [15]
 While the "sovereign" judge admired by Justices Douglas and Black is a figure not without appeal, there are now over 900 federal judges. If each were wholly "sovereign," one wonders whether the nation could--or would--absorb so many potentates
 
 
 [16]
 Further protection against complaints that might chill the decision-making process is provided by the provision in the Act which authorizes a Chief Judge, at the outset, to dismiss a complaint if he finds it to be "directly related to the merits of a decision or procedural ruling." 28 U.S.C. Sec. 372(c)(3)(A)(ii)
 
 
 [17]
 During debate in the Senate, Senator DeConcini expressed the opinion that the Act's grant of authority to certify disability or request voluntary retirement could benefit the judge under inquiry by providing an alternative to the stigma of impeachment proceedings where a judge's aberrant behavior was an innocent product of poor mental or physical condition. 126 Cong.Rec. S13859 (1980)
 
 
 [18]
 The Act's legislative history indicates that one of "the overriding principles governing the Act" was "the recognition that the informal, collegial resolution of the great majority of meritorious disability or disciplinary matters is to be the rule rather than the exception. Only in the rare case will it be deemed necessary to invoke the formal statutory procedures and sanctions provided for in the Act." S.Rep. No. 362, 96th Cong., 2d Sess. 3-4, reprinted in 1980 U.S.Code Cong. & Ad.News 4315, 4317
 
 
 [19]
 It was suggested in the course of the House debate that the Act might even be useful in creating a greater awareness of proper judicial behavior on the part of the investigating judges themselves. 126 Cong.Rec. H8786 (1980) (statement of Rep. Moorhead)
 
 
 [20]
 The Act provides that if a judicial council determines that a judge has engaged in conduct "which might constitute one or more grounds for impeachment," it shall promptly certify such determination to the Judicial Conference, section 372(c)(7)(B), and that if the Judicial Conference determines "that consideration of impeachment may be warranted," it "shall so certify and transmit the determination and the record of proceedings to the House of Representatives for whatever action the House of Representatives considers to be necessary." Section 372(c)(8)
 The Judicial Conference of the United States, summonsed and presided over by the Chief Justice of the United States, consists of the chief judges of all the circuits and of district judge representatives. 28 U.S.C. Sec. 331. It is of some moment that for an impeachment certification to reach the House under the Act, it must be approved by a body that includes the senior representatives of every circuit court as well as representative district judges from all over the nation.
 
 
 [21]
 That section provides, "Any person alleging that a circuit, district, or bankruptcy judge, or a magistrate, has engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts, or alleging that such a judge or magistrate is unable to discharge all the duties of office by reason of mental or physical disability, may file with the clerk of the court of appeals for the circuit a written complaint containing a brief statement of the facts constituting such conduct." Such a complaint may be dismissed by the chief judge if, inter alia, it is "directly related to the merits of a decision or procedural ruling." 28 U.S.C. Sec. 372(c)(3)(A)(ii)
 
 
 [22]
 Even were we to reach the issue, it seems clear, at least on preliminary examination, that the Act's standard of conduct is facially valid, whatever may be its validity in particular applications. To begin with, since the Act does not provide for criminal sanctions, it need not meet the more exacting vagueness standards governing the definition of criminal conduct. See Arnett v. Kennedy, 416 U.S. 134, 159, 94 S.Ct. 1633, 1646, 40 L.Ed.2d 15 (1974) (opinion of Rehnquist, J.). Given the limited nature of at least most of the Act's sanctions, see subsection (2), supra, our threshold inquiry may be correspondingly less searching. Under these circumstances, we believe that the Act's standard--articulated in language closely tied to the permissible sphere of courts' administrative functions set out in Chandler--describes with adequate explicitness the judicial conduct that may be investigated. It would hardly be feasible for Congress to spell out in detail the infinite variety of factual situations that might properly give rise to a complaint warranting an investigation. See Arnett, 416 U.S. at 159-62, 94 S.Ct. at 1646-48. Congress intended construction of the statutory standard to be guided not only by the category of potentially impeachable offenses, but also by the Code of Judicial Conduct as well as resolutions of the Judicial Conference and particular Acts of Congress relating to judicial conduct. S.Rep. No. 362, 96th Cong., 2d Sess. 9, reprinted in 1980 U.S.Code Cong. & Ad.News 4315, 4323. Accordingly, it seems clear that, with the possible exception of certain marginal cases, a judge can reasonably be expected to understand whether or not contemplated conduct will fall within the Act. Similarly, we see no basis for facial invalidation of the Act on grounds of overbreadth, since, even if in certain marginal applications the Act's standard of conduct might impermissibly intrude on first amendment rights, such defects are insubstantial "judged in relation to the statute's plainly legitimate sweep" and can be effectively dealt with by case-by-case analysis. Broadrick v. Oklahoma, 413 U.S. 601, 615, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973). See Parker v. Levy, 417 U.S. 733, 760-61, 94 S.Ct. 2547, 2563-64, 41 L.Ed.2d 439 (1974); CSC v. Letter Carriers, 413 U.S. 548, 580-81, 93 S.Ct. 2880, 2897-98, 37 L.Ed.2d 796 (1973)
 
 
 [23]
 We need not deal with Judge Hastings' claim in Hastings --not specifically pressed here by appellants--that his due process rights were infringed by the inclusion on the Committee of particular judges allegedly biased against him. That contention is plainly too remote to be of concern to the subpoenaed witnesses and need not be resolved as a prerequisite to mere enforcement of a Committee subpoena
 
 
 [24]
 Appellants did not include these two claims in their suit in the district court now on appeal herein, but have raised them only as part of the original subpoena enforcement action
 
 
 [25]
 Appellants suggest that FBI agents--beyond mere service of subpoenas--may have impermissibly aided the Committee's investigation of Judge Hastings, although they do not make clear what role the FBI is alleged to have played. They assert that such purported FBI involvement violates both the Act, which they claim does not authorize any executive branch investigation of accused judges, and constitutional separation of powers principles, which they claim would bar any such investigation by executive agents. This claim, however, is beyond our jurisdiction since even if the FBI in fact had exceeded its statutory or constitutional prerogatives, that would not render invalid either the Committee's proceedings or the subpoenas issued in aid thereof
 
 
 [26]
 Judge Hastings is a party before us only in the appeal, where he seeks return of the documents Williams produced in response to the Committee's first subpoena. The issue of Williams' custody and control of the subpoenaed documents has been raised only in the original action before us--to which Judge Hastings is not a party--concerning enforcement of the Committee's second subpoena to Williams. As a practical matter, however, the issues regarding enforcement of both Committee subpoenas to Williams are essentially the same, and arguments technically raised only as to one apply equally to the other. Judge Hastings and Williams share the same legal representation. It would defy reason to conclude that Judge Hastings has lacked the opportunity to present his position as to the second subpoena when it is incontestable that he has had, and has utilized, that opportunity as to the first
 
 
 [27]
 In view of our disposition of Simons' and Miller's privilege claims, infra, we decline the invitation to enter a protective order circumscribing the scope of examination of Williams and Ehrlich prior to their appearance before the Committee
 
 
 [28]
 Although telephone message books, logs and, more particularly, memoranda might occasionally reveal the substance of communications with other judges, with staff, or the like, and although we do not rule out unusual circumstances in which the mere fact that a judge met with a particular person at a particular time might convey a confidential substantive message within the confines of the asserted privilege, no one has directed our attention to any such special considerations
 
 
 [29]
 On the basis of this finding, as well as our previous finding that the Committee's subpoenas to Williams were not misdirected, we affirm the district court's dismissal of Judge Hastings' equitable replevin claim for recovery of those documents already produced by Williams in compliance with the Committee's first subpoena served on Williams on April 11, 1985. The Committee is entitled to secure possession of those documents, until now held by the FBI pending this court's ruling
 
 
 [30]
 This is not to suggest that the same balance would necessarily be struck when analyzing a judicial investigating committee's right to discover a fellow judge's communications and a court's right to hear a President's. Different policies as well as separate branches of government are implicated. But Nixon clearly provides general guidance
 
 
 [31]
 Bribery, together with treason, is one of the two specified "high Crimes and Misdemeanors" for which removal from office on impeachment is authorized in the Constitution. Art. II, Sec. 4
 
 
 [32]
 Although it would seem likely that Simons and Miller testified before the Hastings grand jury pursuant to a waiver of any privilege by Judge Hastings, there is not sufficient evidence before us to permit a ruling that Judge Hastings in fact directed them to testify before the grand jury and thereby waived any privilege as to that testimony. While the holder of a privilege also can waive it by permitting a breach of the privilege in his presence, there is no evidence before us that Judge Hastings was present when Simons and Miller testified in prior proceedings (although presumably Judge Hastings was present during Miller's testimony at his own criminal trial). In any case, we have not been provided with transcripts of Simons' and Miller's prior testimony and so could not determine the scope of any waiver
 
 
 [33]
 Although it is true that the Committee's counsel also undoubtedly will have access to the privileged materials, it is reasonable to assume that the Committee will employ trustworthy counsel and instruct counsel to respect the confidentiality of these materials. Counsel's access to the materials presents no greater risk of disclosure than the United States Attorney's access to confidential documents in a grand jury proceeding, or the access of a judge's law clerk or other staff to sensitive documents examined in camera
 
 
 [34]
 That section provides,
 All papers, documents, and records of proceedings related to investigations conducted under this subsection shall be confidential and shall not be disclosed by any person in any proceeding unless
 (A) the judicial council of the circuit, the Judicial Conference of the United States, or the Senate or the House of Representatives by resolution, releases any such material which is believed necessary to an impeachment investigation or trial of a judge under article I of the Constitution; or
 (B) authorized in writing by the judge or magistrate who is the subject to the complaint and by the chief judge of the circuit, the Chief Justice, or the chairman of the standing committee established under section 331 of this title.
 28 U.S.C. Sec. 372(c)(14).